DELAWARE SOLID WASTE AUTHORI-
TY, Defendant Below, Appellant,

v.

The NEWS–JOURNAL COMPANY,
Nancy Kesler, Eleanor Shaw,
Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: March 29, 1984.

Decided: July 9, 1984.

I. Barry Guerke, Parkowski, Noble &
Guerke, P.A., Dover, for appellant.

Harvey Bernard Rubenstein, Wilming-
ton, for appellees.

Before HERRMANN, Chief Justice,
MOORE and CHRISTIE, Justices.

MOORE, Justice:

This case arises under the Delaware
Freedom of Information Act (the Act).
The principal issue is whether standing
committees of a State agency are public
bodies under section 10002(a) of the Act,
and thus subject to its open meeting provi-
sions.[1] This is the first time we have spo-
ken on the subject. The News-Journal
Company, a publisher of Wilmington news-
papers, and two of its reporters (collective-

---

**1.** Section 10002(a) states:
  "Public body" means any regulatory, adminis-
  trative, advisory, executive or legislative body
  of the State or any political subdivision of the
  State including, but not limited to, any board,
  bureau, commission, department, agency,
  committee, counsel, legislative committee, as-
  sociation or any other entity established by an
  act of the General Assembly of the State,
  which: (1) is supported in whole or in part by
  public funds; (2) expends or disburses public
  funds; or (3) is specifically charged by any
  other public body to advise or make recom-
  mendations.
  29 *Del.C.* § 10002(a).

ly, the newspapers) sought mandamus and a declaratory judgment in the Superior Court requiring the Delaware Solid Waste Authority (the Authority) to comply with the Act and to cease denying the newspapers access to meetings of the Authority's standing committees.

The Superior Court granted the newspapers' motion for summary judgment, holding that both the Authority and its standing committees were public bodies under the Act. The Authority appeals. We affirm the Superior Court's conclusion that the Authority is a public body subject to the Act. However, we cannot agree that the Act contemplates the inclusion of the Authority's standing committees. Accordingly, we reverse that aspect of the judgment below.

## I.

The Authority was created by statute in 1975 as a "body politic and corporate" to develop and implement a statewide solid waste management plan. See 7 *Del. C.* §§ 6401(c)(5), 6403(a). It consists of seven directors appointed by the Governor, and confirmed by the Senate, for a three year term. It is charged with the collection, storage, utilization, and disposal of solid waste. *Id.* § 6401(c)(1). The Authority also is responsible for the recovery of useful materials from solid waste, for disposing of solid waste while protecting environmental resources, and for cooperating with all federal and state agencies, including the Environmental Protection Agency. *Id.* § 6401(c)(2)–(4).

One director acts as chairman, and by law five directors constitute a quorum for "purposes of conducting business". *Id.* § 6403(c). The Authority has its own manager and staff of employees. *Id.* § 6405. It is granted numerous powers by statute, including the power to contract, to adopt rules and regulations, and to punish violations thereof.

Originally, the Authority's organizational structure consisted of several informal, ad hoc committees composed of not more than four directors, named by the chairman, to investigate specific areas of the Authority's operations. These ad hoc committees met on informal and infrequent bases. However, their reports, when rendered, were made to the full board at its monthly meetings. Upon completing an assignment, a committee would then cease to exist.

On March 15, 1979, the chairman of the Authority replaced the ad hoc committee system with four standing committees: Policy Affairs, Administrative Affairs, Technical Affairs, and Citizens Affairs. Each committee is composed of four Authority directors, and one of the four acts as chairman. The standing committees, like their ad hoc predecessors, investigate Authority operations and then report their conclusions and recommendations, if any, to the full board. These committees also meet on an informal basis, sometimes with only two or three directors present. While such sessions are private, all meetings of the Authority, where the work of the committees is discussed, are open to the public. There are no contentions that the Authority's meetings fail to meet the requirements of the Act.

In June 1981, the newspapers brought this suit. The plaintiffs alleged that the Authority and its standing committees were "public bodies" under the Act and that the meetings of the Authority and its standing committees were "meetings" within the contemplation of 29 *Del. C.* § 10002(e).[2] The thrust of the complaint was that these committees did not hold open, public sessions and denied News-Journal reporters the right to attend.

However, the issues as ultimately framed to us are whether the Authority and its standing committees are public bodies within the meaning of the Act, [29

---

**2.** This definitional provision states that " '[m]eeting' means any formal or informal gathering of a quorum of the members of any public body for the purpose of discussing or taking action on public business". *Id.* § 10002(e).

*Del.C.* § 10002(a) ]. As to the latter, it is contended that they discharged a sufficient number of Authority functions to be deemed de facto public bodies, even though they consisted of less than the Authority's statutory quorum of five directors. *See* 7 *Del.C.* § 6403(c).

In holding that the Authority was a public body subject to the Act, the Superior Court reasoned that nearly $800,000 received by the Authority from the State were "public funds" under section 10002(c),[3] thereby making it a public body within the purview of section 10002(a) of the Act. As for the standing committees, the trial court held them subject to the open meeting provisions of the Act, as independent public bodies exercising de facto Authority powers, even though they consisted of less than the statutory quorum of five directors.

On appeal, the Authority claims that it is not a public body under § 10002(a)(1), because it is neither supported in whole or in part by public funds, nor does it expend or disburse public funds as the Act requires. *See* 29 *Del.C.* § 10002(a)(1), (2). In particular, the Authority contends that the funds it receives from the State are "grants-in-aid," which are specifically excluded from the definition of "public funds" under 29 *Del.C.* § 10002(c).[4] Alternatively, the Authority suggests that even if its State funding is not exempt under section 10002(c), the amount thereof, relative to other revenues, is *de minimus*, and therefore insufficient to qualify the Authority as a public body. Finally, the Authority points to the fact that its own voluntarily instituted open meeting procedures satisfy the public access standards of the Act, even though it is contended that the Act itself is inapplicable. Thus, it is argued that such internal sunshine provisions are an effective substitute for the Act. *See* 7 *Del.C.* 6403(i)–(*l* ).

As to its standing committees, the Authority argues that these groups are not public bodies, separate and distinct from the Authority itself, because the committees were not created by statute, and only perform the limited function of gathering information. Since the committees operate with less than the statutory quorum of five, it is suggested that they are not subject to the Act under section 10002(e).

In response, the newspapers argue that the Authority is a public body because it performs a state regulatory function, is supported in part by public funds, and also expends or disburses public funds. *See* 29 *Del.C.* § 10002(a)(1), (2). The newspapers also contend that the grants-in-aid exclusion of section 10002(c) was not intended to immunize regulating bodies, like the Authority, from the Act. Similarly, plaintiffs contend that any state funding, irrespective of amount, is sufficient to bring a State agency within the purpose and scope of the Act.

The newspapers argue that the Authority's standing committees are themselves public bodies, subject to the Act, because they perform all of the Authority's functions. Plaintiffs also submit that notwithstanding the statutorily defined "quorum", any act of a standing committee taken by four directors, or even fewer than that number, nonetheless constitutes a quorum and a meeting under 29 *Del.C.* § 10002(e). Plaintiffs support this conclusion by noting that otherwise, any public body could avoid

---

**3.** Public funds are defined as: "those funds derived from the State or any political subdivision of the State, but not including grants-in-aid". *Id.* § 10002(c).

**4.** The Authority argues that "funds derived from the State" are direct subsidies or appropriations and that grants-in-aid are supplemental appropriations from the State to private or quasi-public organizations in limited amounts. It should be noted that section 6301(5) of the Delaware Budget Commission and Appropriations Act of 1982 defines "grant-in-aid" as "an appropriation of the public money from the General Fund for a public purpose to any county, municipality, corporation, private agency or person". 29 *Del.C.* § 6301(5). It should also be noted that statutory exclusion of grants-in-aid was removed from section 10002(c) by 64 Del.Laws, c. 113, effective July 8, 1983.

open meetings under the Act by setting its own requirements. In addition, plaintiffs argue that section 10002(a) by its language contemplates committees as public bodies and that the standing committees, the products of the Authority's exercise of its statutory powers under 7 *Del.C.* §§ 6403(e), 6406(a)(1), were by extension "established by an act of the General Assembly of the State". *See* 29 *Del.C.* § 10002(a). Finally, plaintiffs argue that their construction of the Act is consistent with the legislative intent underlying that statute, to promote public awareness of the performance of public officials and of the decisions they render. *See id.* § 10001.

## II.

### A.

■ Sunshine laws requiring that meetings of governmental or public bodies be open to the public have been enacted in every state. C.S. Rhyne, The Law of Local Government Operations, § 9.1, at 134 (1980). *See* Annot., 33 A.L.R.3d 1070 (1971 & Supp.1983) (Validity, construction, and application of statutes making public proceedings open to the public). These open meeting laws ensure governmental accountability, inform the electorate, and acknowledge that public entities, as instruments of government, should not have the power to decide what is good for the public to know. *Id.* at 135. *See* E. McQuillin, Law of Municipal Corporations, § 13.07a (1979). *Cf. FCC v. ITT World Communications, Inc., et al.,* — U.S. — at —, 104 S.Ct. 1936 at 1940, 80 L.Ed.2d 480 (1984). In addition, open meeting laws promote the free flow of information so that the news media may report events accurately, rather than being forced to rely on potentially biased or inaccurate leaks. *Id.*

Consistent with these salutary purposes, open meeting laws are liberally construed, and closed session exceptions within these statutes are strictly interpreted to limit nonpublic meetings. E. McQuillin, Law of Municipal Corporations, § 13.07a (1979). *Accord Wexford County Prosecuting Attorney v. Pranger,* 83 Mich.App. 197, 268 N.W.2d 344 (1978); *City of Danville v. Laird,* 223 Va. 271, 288 S.E.2d 429 (1982).

The Delaware sunshine law contains provisions for open meetings and open records. *See* 29 *Del.C.* §§ 10003, 10004 (codifying 60 Del.Laws, c. 641). Prefacing these provisions is a concise statement of the legislative policy underlying the Act:

[i]t is vital in a democratic society that public business be performed in an open and public manner so that the citizens shall be advised of the performance of public officials and of the decisions that are made by such officials in formulating and executing public policy. Toward this end, this chapter is adopted, and shall be construed.

29 *Del.C.* § 10001.

Substantively, the Act establishes a public right to inspect all public records. *See* 29 *Del.C.* § 10003(a). It authorizes all public bodies subject to its requirements to establish rules and regulations regarding access to public records. Section 10002(d), in defining the term "public record," contains twelve exceptions to the otherwise absolute right of access. *Id.* § 10002(d). Each exception is intended for the protection of personal privacy. *See id.*

Section 10004(a) establishes the right of the public to attend all meetings of all public bodies. However, provision is made for executive sessions, closed to the public, solely for any of thirteen specific purposes.[5] *See* § 10004(b)(1)–(13). Moreover,

---

**5.** Executive sessions are permitted under the following circumstances:

(b) A public body at any meeting may call for an executive session closed to the public pursuant to subsection (c) of this section for any of the following purposes:

(1) Discussion of individual citizen's qualifications to hold a job or pursue training unless the citizen requests that such a meeting be open;

(2) Preliminary discussions on site acquisitions for any publicly funded capital improvements;

deliberations of judicial bodies are exempt. *See id.* § 10004(g). The discretion to hold executive sessions is not unfettered. Section 10004(c) imposes strict requirements regarding such meetings, including a majority vote at a prior public meeting, public announcement of the purpose of the closed meeting in advance thereof, limiting the agenda at the closed meeting to public business, requiring that any vote be taken at a subsequent public meeting, and requiring disclosure of the results of that vote. *Id.* § 10004(c).

Tying the open meeting and open record provisions together, section 10004(f) of the Act mandates that all public bodies keep minutes of all regular, special, and emergency meetings available as public records for public inspection. *Id.* § 10004(f). Finally, section 10005 provides for citizen enforcement of the Act through a declaratory judgment, writ of mandamus, or equitable relief in the Court of Chancery. *Id.* § 10005.

#### B.

Turning to the keystone, definitional provision of the Act, section 10002, a "public body" consists of two principal elements. First, the organization must fall into one or both of the broad categories of executive or legislative entities of the State or a political subdivision thereof. *See* 29 *Del.C.* § 10002(a), note 1, *supra.* Examples of such groups are enumerated within the statute, and by way of further illustration, section 10002(a) includes "any other entity established by an act of the General Assembly of the State". *Id.* The second definitional element of a public body is that the entity be supported in whole or part by public funds, expend or disburse such public funds, or be specifically charged by any other public body to advise or make recommendations. *Id. See* note 1 *supra.* Public funds are those "derived from the State ... but not including grants-in-aid". *Id.* § 10002(c). *See* notes 3 & 4 *supra.*

#### III.

■ Here, the conclusion is inescapable that the Authority is a public body and subject to the Act. As to the first definitional element of section 10002(a), the Authority was established by the General Assembly to regulate and manage solid waste throughout this State. *See* 60 Del.Laws, c. 288, § 1 et seq. codified at 7 *Del.C.* § 6401 et seq. *See also* 7 *Del.C.* § 6403(a) (terming the Authority "a public instrumentality

(3) Activities of any law-enforcement agency in its efforts to collect information leading to criminal apprehension;

(4) Strategy sessions with respect to collective bargaining, pending or potential litigation, when an open meeting would have effect on the bargaining or litigation position of the public body;

(5) Discussions which would disclose the identity of the contributor of a bona fide and lawful charitable contribution to the public body whenever public anonymity has been requested of the public body with respect to said contribution by the contributor;

(6) Discussion of the content of documents, excluded from the definition of "public record" in § 10002 of this title where such discussion may disclose the contents of such documents;

(7) The hearing of student disciplinary cases unless the student requests a public hearing;

(8) The hearing of employee disciplinary or dismissal cases unless the employee requests a public hearing;

(9) Personnel matters in which the names, competency and abilities of individual employees or students are discussed;

(10) Training and orientation sessions conducted to assist members of the public body in the fulfillment of their responsibilities;

(11) Discussion of potential or actual emergencies related to preservation of the public peace, health and safety;

(12) Where the public body has requested an attorney-at-law to render his legal advice or opinion concerning an issue or matter under discussion by the public body and where it has not yet taken a public stand or reached a conclusion in the matter; or

(13) Preliminary discussions resulting from tentative information relating to the management of the public schools in the following areas: School attendance zones; personnel needs; and fiscal requirements.

*29 Del.C.* § 10004(b)(1)–(13).

of the State established and created for the performance of an essential public and governmental function ...""). Personnel of the Authority are deemed classified employees under the state merit system. 7 Del. C. § 6405(c). In addition, staff members are included under and subject to Chapter 55 of Title 29, the State Employees' Pension Plan. Id. § 6405(e). The Authority is charged with making annual reports to the Governor and the General Assembly, detailing its operations and transactions, as well as other data which it deems desirable. Id. § 6416(b). Finally, the Authority's functional characteristics and the powers expressly granted to it bring it within the categorical element of public body status. See id. §§ 6404 (Authority functions); 6406 (Authority powers); 6407 (powers regarding funds and transfers of interests); 6408 (private contracting power); 6417 (sanctions); 6418 (power to issue bonds).

As to the funding element expressed in the alternative subsections in 10002(a), it is evident that the Authority has been supported partly by public funds and has expended such funds in its operations. See id. § 10002(a)(1), (2). At the time this action was instituted, public funds were defined in the Act as those "derived from the State or any political subdivision of the State, but not including grants-in-aid". Id. § 10002(c). See note 4 supra.[6] The term "grants-in-aid" would effectively preclude the Act's coverage by narrowing the definition of public funds in section 10002(c), and thereby, restrict the scope of the definition of public bodies in section 10002(a). This was recognized by the General Assembly in 1982, when it deleted the grants-in-aid exclusion. See note 4 supra. Such legislative action indicates a continuing resolve to expand the Act's coverage. Given the

strong policy interests underlying the Act, the General Assembly's continuing commitment to those interests, and the rule that open meeting laws are liberally construed, we believe that "grants-in-aid" do not include the initial appropriations the Authority received to begin operations. See Wexford, 83 Mich.App. 197, 268 N.W.2d 344 (1978); Danville, 223 Va. 271, 288 S.E.2d 429 (1982). There is no evidence that such funds were other than a regular budgetary appropriation, except the statement of the defendant's general manager that "the money was appropriated to give the Authority, in effect, a grant-in-aid ...". Such a conclusory assertion is wholly inadequate. The grant-in-aid exclusion cannot be used here as a shield against the Act.

The Authority's argument, that the appropriations received were de minimus, ignores the plain language of the Act. Section 10002(a)(1) specifically states " '[p]ublic body' means any ... entity ... which: (1) is supported in whole or in part by public funds". 29 Del. C. § 10002(a)(1) (emphasis added). This is an express provision conceived by the legislature to promote the policy interests underlying the Act and to preclude specious de minimus arguments. Similarly, the Authority's contention, that its own internal sunshine provisions are adequate, ignores the legislative intent to bring public bodies under the aegis of the Act. Accepting the defendant's argument would in effect write the Act out of existence. The Authority has failed to present any evidence raising a genuine factual issue as to its status as a public body. Thus, given its qualifications under the categorical and funding elements of section 10002(a), we must agree with the Superior

**6.** Section 6301(5) of the Budget Commission and Appropriations Act defines a grant-in-aid as "an appropriation of the public money from the General Fund for a public purpose to any county, municipality, corporation, private agency, or person". 29 Del. C. § 6301(5). The General Fund includes:

All moneys derived from taxes, fees, permits, licenses, fine, forfeitures or from any other sources ... including the sale or disposition of surplus or other property of the State and of every agency thereof including receipts heretofore authorized as funds for specific use of any agency by the authority of any law of this State ...

Budget, Fiscal, Procurement, and Contracting Regulations Act, 29 Del. C. § 6102(a).

Court that the Authority is a public body subject to the Act.

## IV.

### A.

A more doubtful question is the newspapers' claim that the Authority's "standing committees" are subject to the Act. This issue presents a clash between the plain words of a statute and the newspapers' demand for virtually total access to a State agency. Yet, in the face of clear statutory language, our duty is a limited one. The following observation of Justice Holmes is instructive:

> "... while at times judges need for their work the training of economists or statesmen, and must act in view of their foresight of consequences, yet when their task is to interpret and apply the words of a statute, their function is merely academic to begin with—to read English intelligently—and a consideration of consequences comes into play, if at all, only when the meaning of the words used is open to reasonable doubt."

*Northern Securities Co. v. United States,* 193 U.S. 197, 401, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904). We note first that section 10002(e) defines a meeting as "any formal or informal gathering of a *quorum* of the members of any public body for the purpose of discussing or taking action on public business". 29 *Del.C.* § 10002(e) (emphasis added).

■ The term "quorum" is not defined in the Act and reference must be made to the statutory or other regulations governing the agency in question. Here, 7 *Del.C.* § 6403(c) could not be clearer. It provides that "[f]or purposes of conducting business of the Authority, 5 directors shall constitute a quorum". This statute predates the Act by nearly two years; hence, the General Assembly is presumed to have been aware of the quorum specification in section 6403(c) when the Act was adopted. *Cf.*

*News-Journal Co. v. McLaughlin,* Del.Ch., 377 A.2d 358, 361 & n. 2 (1977). Moreover, we note that the legislature could have used the term "majority" or specified other circumstances constituting a "meeting", but did not do so. *E.g., Internat'l Ass'n of Firefighters, Loc. 2479 v. Thorpe,* Okla. Supr., 632 P.2d 408, 409 n. 1 (1981). Given this clear statutory language, there can be no basis on which to infer that the standing committees are within the comprehension of the Act.

We reach this result with reluctance and concern that it may be misconstrued as a license for abuse. That would be unfortunate, and we trust that a cautionary word to state agencies will suffice. A court of equity would not be powerless to devise an appropriate remedy in the face of conduct deliberately intended to defeat the Act's essential aims. But as we have previously stated, this Court does not "sit as a super-legislature to eviscerate proper legislative enactments. If the policy or wisdom of a particular law is questioned as unreasonable or unjust, then only the elected representatives of the people may amend or repeal it. Judges must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override properly stated legislative will." *Public Service Commission v. Wilmington Suburban Water Corporation,* Del.Supr., 467 A.2d 446, 451 (1983).

On its face the quorum requirement thus represents legislative deference to the internal operating procedures of public bodies, regardless of whether those procedures are set by statute, as here, bylaw, charter provision, or otherwise. *See News-Journal Co. v. McLaughlin,* Del.Ch., 377 A.2d 358, 361 & n. 2 (1977) (city council conceded meeting of 11 of 13 members was a quorum under City Code § 2–204).[7]

In addition, the quorum requirement embodied in section 10002(e) of the Act represents a legislative attempt, based on public policy reasons, to limit the reach of the

---

7. This disposes of plaintiffs' argument that absent a specific definition of "quorum," the common law definition of quorum, i.e., a simple majority, applies.

open meeting law. 29 *Del.C.* § 10002(e). *Cf.* §§ 10002(d); 10004(b); 10004(g) (providing exceptions to the open meetings requirement). This brightline standard is a legislative recognition of a demarcation between the public's right of access and the practical necessity that government must function on an orderly, but nonetheless legitimate, basis. The legislature has thus recognized that literal enforcement of the sunshine law at the standing committee level could so disrupt the orderly function of the Authority as to defeat the basic purposes for which it was created. The gathering of information and the free exchange of ideas should not be hampered at the outset, and thus dampen a careful examination of potentially controversial matters, before the Authority can even function. *See* C.S. Rhyne, *The Law of Local Government Operations*, § 9.1, at 135–36 (1980). Certainly this does not rise to the level of "closed door" government. The public's right of access at later stages in the decisionmaking process, and its accompanying right to question, is a strong safeguard that public servants remain accountable to the citizens. Any interpretation of the Act beyond its obvious purpose and intent could bring the wheels of government to a halt.

The newspapers argue that the committees are themselves public bodies because they perform all of the Authority's functions. However, plaintiffs have failed to present evidence raising any factual question on this point. From the record it is clear that the standing committees perform significant data-gathering and analytical functions. Having distilled information on the Authority's operations, the committees publicly present this information to the entire board of directors, along with specific recommendations. The board then publicly considers the data presented and publicly discusses the various recommendations, as well as alternative policy options not presented by the particular committee. After debate the Authority as a whole publicly renders a policy decision, and publicly takes steps to implement it. Throughout its meetings the Authority is open to public questions, comment and criticism. Once a decision is made, the particular standing committee has no further role in the matter. *Compare Polillo v. Deane*, 74 N.J. 562, 379 A.2d 211, 216–17 (1977).

Plaintiffs also contend that the standing committees are public bodies because the nonexclusive list of entities in section 10002(a) specifically includes committees. *See* 29 *Del.C.* § 10002(a). However, the provision is qualified by the phrase "established by an act of the General Assembly of the State". *Id.* Here, the committees were established by the Authority itself, not the legislature. Hence, the newspapers' argument falls.

### B.

Plaintiffs' principal objection to the exemption of standing committees from the Act is the prospect for overbearing, and blind reliance by the board as a whole on a particular committee. This fear may not be unreasonable. *See, e.g., Bradbury v. Shaw*, 116 N.H. 388, 360 A.2d 123 (1976) (holding mayor's industrial advisory committee subject to sunshine law). However, public officials have a high duty to be faithful and scrupulously diligent in the performance of their work. Public service is not an end in itself. It must be based on a constant recognition of the unyielding precept that those who serve do so on behalf of and in the best interests of their fellow citizens. If that point becomes lost, then government fails of its basic purpose and those responsible have no further claim on the public's trust.

But in reaching our conclusion here, it is crucial to note that the newspapers did not present any evidence of probative value that the function and operation of the standing committees, either in theory or effect, are the result of a deliberate intent to defeat the Act's essential aims. If anything, the record is to the contrary. Meetings of the Authority's board are open to the public. At such meetings, the public

may ascertain not only the questions before the board, but also the factors which led to the crystallization of those issues. Because all standing committee members are also directors, and will be present at open Authority board meetings, the public has the opportunity to scrutinize carefully the entire decisionmaking process. This public scrutiny should prevent the willful or unintended control of information by or on behalf of the board. Such public scrutiny goes to the very essence of the Act by ensuring governmental accountability, by informing the electorate, and by acknowledging that public entities, as instruments of government, should not have the power to decide what is good for the public to know. *See* E. McQuillin, Law of Municipal Corporations, § 13.07a (1979); C.S. Rhyne, The Law of Local Government Operations, § 9.1, at 134–35 (1980). *Cf. FCC v. ITT World Communications, Inc., et al.,* —— U.S. —— at ——, 104 S.Ct. 1936 at 1940, 80 L.Ed.2d 480 (1984). The General Assembly's mandate that "citizens shall be advised of the performance of public officials and of the decisions that are made by such officials in formulating and executing public policy" only serves to reinforce our belief that the Authority is on notice of its duties to the public. *See* 29 *Del.C.* § 10001.

Based on the definition of a quorum in 7 *Del.C.* § 6403(c), and of a "meeting" in section 10002(e) of the Act, we can only conclude that sessions of the Authority's four-director standing committees are not subject to the Act. Furthermore, the newspapers after a full opportunity to develop the record have not shown that either the intent or effect of the system of standing committees defeats the basic purposes of the Act. Accordingly, we reverse the Superior Court's determination that the standing committees are subject to the Act. However, we affirm the Superior Court's conclusion that the Authority is a public body with full accountability under the Act.

\*　　\*　　\*

AFFIRMED IN PART, REVERSED IN PART.