Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/04/2019 09:07 AM CDT

Mark Allen Koch, appellant, v. Lower Loup
Natural Resources District, appellee.
___ N.W.2d ___

Filed June 4, 2019.    No. A-17-1257.

1. **Actions: Equity: Public Meetings: Appeal and Error.** An appellate
court reviews actions for relief under Nebraska's Open Meetings Act
in equity because the relief sought is in the nature of a declaration that
action taken in violation of the act is void or voidable.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appel-
late court tries factual questions de novo on the record and, as to ques-
tions of both fact and law, is obligated to reach a conclusion independent
of the conclusion reached by the trial court. But when credible evidence
is in conflict on material issues of fact, an appellate court considers and
may give weight to the fact the trial court observed the witnesses and
accepted one version of the facts over another.
3. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
tion of law, for which an appellate court has an obligation to reach
an independent conclusion irrespective of the decision made by the
court below.
4. **Public Meetings: Words and Phrases.** Although the Open Meetings
Act does not define "subcommittee," a subcommittee is generally
defined as a group within a committee to which the committee may
refer business.
5. **Public Meetings: Public Policy.** The purpose of the Open Meetings Act
is to prevent the formation of public policy in secret.
6. **Public Meetings: Public Policy: Legislature.** The Open Meetings Act
does not require policymakers to remain ignorant of the issues they
must decide until the moment the public is invited to comment on a pro-
posed policy. By excluding nonquorum subgroups from the definition of
a public body, the Legislature has balanced the public's need to be heard
on matters of public policy with a practical accommodation for a public
body's need for information to conduct business.

7. **Public Meetings.** The prohibition against decisions or formal action in a closed session also proscribes rubberstamping or reenacting by a pro forma vote any decision reached during a closed session.

Appeal from the District Court for Valley County: KARIN L. NOAKES, Judge. Affirmed.

Mark Allen Koch, pro se.

Thomas S. Kruml, of Kruml Law Office, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Mark Allen Koch filed a pro se complaint requesting a writ of mandamus to void various meetings of the Lower Loup Natural Resources District Programs/Projects Committee (Committee), and all actions taken therein and therefrom, alleging that the Committee violated Nebraska's Open Meetings Act, Neb. Rev. Stat. §§ 84-1407 to 84-1414 (Reissue 2014 & Cum. Supp. 2018). The district court for Valley County granted summary judgment in favor of the Lower Loup Natural Resources District (Lower Loup NRD). Koch appealed, and this court reversed the judgment and remanded the cause for further proceedings. See *Koch v. Lower Loup NRD*, No. A-15-559, 2016 WL 7209828 (Neb. App. Dec. 13, 2016) (selected for posting to court website). After a postremand bench trial, the district court determined that the Committee was not functioning as a "public body" during the meetings complained of and that therefore, it did not violate the Open Meetings Act. Koch's requested relief was denied, and judgment was entered in favor of the Lower Loup NRD. Koch appeals; we affirm.

## II. FACTUAL BACKGROUND

This case concerns four meetings that took place in June and July 2014: two meetings of the Committee (June 17 and

July 15) and two meetings of the Lower Loup NRD Board of Directors (Board) (June 26 and July 24). Koch attended the meetings as a citizen, but also as a spokesman for the "Bredthauer Dam Proposal," a project which was discussed at the meetings. We briefly summarize what happened at these four meetings.

## 1. June 17, 2014—Committee Meeting

The Committee held a meeting on June 17, 2014. In attendance at that meeting were six Committee members (all of whom were directors on the Board), two other directors from the Board, five staff members, and five members of the public. It is undisputed that Koch, Eugene Bredthauer, and Bredthauer's son were not in the meeting room when the meeting began, but entered some minutes later. Five items appeared on the meeting agenda, one of which was the dam proposal.

The section of the minutes discussing the dam proposal reveals the following: The Committee was informed that Koch was told that in order for him to speak to the Committee, he was to send an updated proposal prior to the meeting so that staff could review the new information before it was presented to the Committee. The proposal was not submitted prior to the meeting. Discussion was had as to how to proceed. It was "again" explained to Koch that "normal procedure" is to give the proposal to staff in advance, then staff would review the information and make recommendations to the Committee; then the Committee would review and discuss the proposal and make recommendations to the Board. The Committee ultimately voted to table the proposal until July, "pending the Bredthauer proposal be[ing] submitted to staff in advance of the meeting, allowing sufficient time to review the proposal."

Other than the budget report, for each of the other items on the agenda, the Committee voted on what recommendation to make to the Board: "City of Columbus Area Recreational Trails (CART) Request"—the Committee voted to recommend

to the Board to rescind the previous monetary commitment to "CART" and to recommend to provide funds for the "Columbus City Hospital Lake Trail" and for the "Lost Creek Trail"; "Lake Ericson Gate Controller Request"—the Committee voted to recommend to the Board to provide funds for the purchase of the "SCADA" system; and "Davis Creek Restroom Doors Bids"—the Committee voted to recommend to the Board that a bid for the restroom doors and ceilings be approved.

## 2. June 26, 2014—Board Meeting

The Board held a meeting on June 26, 2014. The minutes reflect that 17 out of the 21 directors were present at the meeting. Ten staff members were in attendance, as well as several "[g]uests," including Koch and Bredthauer. The section of the minutes titled "Public Comments" provides as follows: Bredthauer told the Board that he had authorized Koch to speak on his behalf regarding the dam proposal. Koch handed out a proposal to each member of the Board and said he understood that the Committee had "tabled the project" until July. The chairman of the Board informed Koch that anything the Board would consider for the proposal needed to be "submitted to management first for [its] review." Koch responded that he would not be commenting on anything in the proposal. However, Koch said the public comment he wanted to make was that he was not allowed to enter the June 17 meeting of the Committee for 15 minutes and that he had wanted to record the meeting and was disappointed when that did not happen. He said he planned to attend the Committee meeting in July and would like to present the proposal in an indepth manner. He also said he hoped it would be a "feasible project."

One of the directors said he requested the dam proposal be put on the June 2014 agenda for the Committee to determine whether the request should be revisited, but that Koch was not "necessarily 'on' the agenda." The director said that the procedure was to "submit information to staff for [its]

review, and if staff felt it was warranted, [staff] would bring it to the Committee"; "staff would determine if the project would be on the July Committee agenda." Leon Koehlmoos, the general manager of the Lower Loup NRD, said that at the June meeting of the Committee, he had said he would review proposals to see if there were any changes from the original discussions with Bredthauer, and if there was nothing new and Koch was asking for the same things as in the past, Koehlmoos "probably would not be taking the information forward." Koch responded that the proposal he distributed to the Board was "an entirely new proposal"; Koehlmoos said he would review it.

The section of the minutes titled "Programs/Projects Committee Report" contains a section regarding the dam proposal and states as follows: A director said that the Committee discussed whether or not to bring the dam proposal "forward" and that it decided not to because Koch and Bredthauer did not follow the protocol of giving information to staff first for its review and letting staff decide whether or not to bring the information to the Committee. The director told the Board that the Committee voted to table the proposal until July, pending the proposal being submitted to staff in advance of the meeting and allowing sufficient time for review. Koehlmoos also told the Board that it was a "misunderstanding" when Koch was not immediately allowed to enter the Committee meeting and that having someone wait to be introduced and brought into a meeting is the process for certain other committee meetings, so "the mistake was not intentional." The chairman stated that "the meeting was advertised as a public meeting, so . . . Koch could have come in right from the beginning"; Koehlmoos agreed and stated he would correct the misunderstanding for public meetings in the future.

The section of the minutes titled "Programs/Projects Committee Report" also contains sections for the "CART" request, the "Lake Ericson Gate Controller Request," and the "Davis Creek Restroom Doors Bids." After a report was given

to the Board on each of these items, the Board took votes on each. The Board's votes were the same as the Committee's recommendations.

### 3. July 15, 2014—Committee Meeting

The Committee held a meeting on July 15, 2014. The Committee minutes appearing in our record do not appear to be a complete copy of the minutes (there are only two pages, and the second page appears to be from the Committee meeting in June). The July minutes state that seven Committee members were present (all of whom are directors on the Board). In addition to six "[s]taff present," the minutes also list Koch and Bredthauer as "[o]thers present." The section of the minutes discussing the dam proposal stated that Koch was informed he could not make a video recording because the Committee meeting was not a public meeting. "Koch reviewed the proposal that he had presented to the Board at its June meeting. Following the presentation, the Board discussed the project, discussing issues with the 404 permit, public access to the property, and the design of the project." The Committee then voted to recommend to the Board that the dam proposal be denied.

Other items discussed were "CART Letters of Support" (letters of support had been received and were included "in the packet" for information purposes), "LLNRD Attendance at County Fairs" (because of cost, Lower Loup NRD decided to stop participating in county fairs "for a year or two and then re-evaluate"), "Headquarter Road Signs" (staff provided Committee "with mock-ups of potential road signs to be added to the Airport Motel sign to direct the public to the office"; Koehlmoos said potential expansion at the motel might mean the sign would be moved, and he proposed waiting on the sign until more information could be received; and Committee consensus was to have staff address the issue, select signs, and have them installed), and "Davis Creek Recreation Areas" (simply states "Water Line Design and Estimates"; it

appears we do not have a complete copy of minutes from this point forward).

### 4. JULY 24, 2014—BOARD MEETING

The Board held a meeting on July 24, 2014. The minutes reflect that 14 out of the 21 directors were present at the meeting. Twelve staff members were in attendance, and Koch and Bredthauer were among those listed as "[g]uests" in attendance. The section of the minutes titled "Public Comments" states that "[t]here were no public comments."

The section of the minutes titled "Programs/Projects Committee Report" contains a section regarding the dam proposal, which states as follows: Koehlmoos said that Koch spent about an hour reviewing the proposal with the Committee on July 15, 2014. A member of both the Committee and the Board stated that Koch's presentation was "very interesting and well presented," but there were issues and unanswered questions about the proposal regarding permits, public access, and design. He also said that there was "a lot of uncertainty" about the proposal and that the Committee "didn't feel comfortable moving forward," so it was recommending denial of the request.

The minutes note that Koch "outlined his concerns regarding the Open Meetings Act" and gave a 15-minute presentation reiterating items in the proposal. Another guest in attendance at the Board meeting then spoke in favor of the dam proposal. Discussion was had "about the project being a private structure, engineering assistance, DNR permit, and funding." Eleven of the directors present at the meeting then voted to deny the dam proposal.

The section of the minutes titled "Programs/Projects Committee Report" also contains sections for the "CART Letters of Support," "LLNRD Attendance at County Fairs," and "Headquarters Road Signs." A report was given to the Board on each of these items; however, no vote of the Board was taken.

The "Programs/Projects Committee Report" also contained a section for the "Davis Creek Recreation Area"; it reflects that more items were addressed at the July 2014 meeting of the Committee than appear in our incomplete copy of the minutes, as we noted above. The Committee report states that the "Water Line Design and Estimates" were discussed. Koehlmoos said that the "water line design was in the budget" and that the Committee recommended requests for bidding be sent out to potential bidders; after the report, the Board voted that requests for bidding be sent to potential bidders for the water system and lines at the recreation area. A "Request for Campground Design" was also discussed for the recreation area. Koehlmoos said there was a need for more campsites at the recreation area, that the Committee discussed the development of a new campsite, and that there was money in the budget for one; "[i]t was the recommendation of staff and the Committee to seek a design." After the report, the Board voted to hire a consultant to design a new campground at the recreation area. The Committee report included updates on two other items, but no votes were taken.

### III. PROCEDURAL BACKGROUND

On October 14, 2014, Koch filed a "Complaint Request for Writ of Mandamus for Open Meetings Act and Freedom of Information Act Violations by the Lower Loup [NRD] and Discrimination Against Koch Repair When Representing the Eugene Bredthauer Dam Project." Koch alleged various violations of the Open Meetings Act. He asked that actions taken in violation of the Open Meetings Act be voided and that those responsible for violating the Open Meetings Act be held accountable. He also requested that the Lower Loup NRD be made to allow him access to public records.

On November 14, 2014, the Lower Loup NRD filed its answer to Koch's complaint, generally denying all allegations. The Lower Loup NRD also alleged affirmative defenses. On December 29, the Lower Loup NRD filed a motion for

summary judgment, alleging that there were no issues of material fact and that it was entitled to judgment as a matter of law.

On March 10, 2015, Koch filed a motion to amend the complaint, stating that the amended complaint was to be filed on March 16.

On March 16, 2015, Koch, without leave of the court, filed an "Amended Complaint for Writ of Mandamus for Open Meetings Act Violations by the Lower Loup Natural Resource District and Discrimination Against Koch Repair Representing the Eugene Bredthauer Dam Project." In his amended complaint, Koch alleged the following "Cause[s] of Action": (1) he was refused access to and the ability to record the first 14 to 16 minutes of the "published public meeting" of the Committee on June 17, 2014; (2) the Lower Loup NRD (a) changed the classification of the Committee to a "sub-committee" to circumvent the Open Meetings Act and then (b) changed the date of the published July 2014 meeting of the Committee without published notification; (3) he was not allowed to video record the July 2014 meeting of the Committee; and (4) (a) he was not allowed to present the dam proposal at the "public meeting" even though the proposal was "on the agenda" (it is unclear which meeting Koch is referring to in his pleading), (b) he was told he would not get to speak if staff decided not to put the proposal on the agenda for the July meeting of the Committee, and (c) staff refused to allow him an agenda item. Koch asked the district court to (1) "void the entire meeting of the Programs and Projects Committee for July, 2014"; (2) order "all information given to the [Board at the] meeting [in] July, 2014 and action taken on that information (including the vote against the Bredthauer Mira Creek Dam Project) from the illegal meeting be voided"; and (3) hold all members of the Committee accountable for violating the Open Meetings Act.

In its journal entry and order filed on March 17, 2015, the district court memorialized the following: A hearing was held

that day on the Lower Loup NRD's motion for summary judgment and on Koch's motion to amend his complaint. At the hearing, the Lower Loup NRD agreed to proceed on Koch's motion to amend his complaint, even though it was not given proper notice. Prior to ruling on the motion, the district court inquired of Koch as to his specific and complete requests for relief in each cause of action alleged in the amended complaint. Koch stated that as to the first cause of action, he was requesting an order declaring the June 17, 2014, meeting void. As to the second cause of action, he was requesting an order requiring the Committee meetings to be open to the public. As to the third cause of action, he was requesting an order directing the Committee to allow video recordings of meetings. As to the fourth cause of action, he was requesting an order directing the Committee to allow citizens to speak at the Committee hearings, including items on the agenda. Koch was also requesting $12,500 in damages and costs. The district court sustained Koch's motion to amend his complaint and found that the amended complaint filed March 16, 2015, was the operative complaint. The Lower Loup NRD was given 7 days to file an amended answer. The district court also granted the Lower Loup NRD's oral motion to continue the motion for summary judgment, and the matter was rescheduled for April 21.

On March 18, 2015, the Lower Loup NRD filed its answer to Koch's amended complaint and denied all allegations. Also on March 18, the Lower Loup NRD filed an amended motion for summary judgment, alleging that there were no issues of material fact and that it was entitled to judgment as a matter of law.

On April 21, 2015, a hearing was held on the Lower Loup NRD's amended motion for summary judgment. In its order filed on June 16, the district court granted summary judgment in favor of the Lower Loup NRD on all causes of action and dismissed Koch's complaint. Koch appealed; this court reversed the judgment and remanded the cause for further

proceedings. See *Koch v. Lower Loup NRD*, No. A-15-559, 2016 WL 7209828 (Neb. App. Dec. 13, 2016) (selected for posting to court website). In our memorandum opinion, we found there was a genuine issue of material fact as to whether the Committee is a subcommittee, and thus exempt from the Open Meetings Act. We also noted that neither the parties nor the district court addressed whether the Committee is an advisory committee which would be subject to the Open Meetings Act.

A postremand bench trial was held on August 28, 2017. Evidence will be discussed as necessary later in our analysis. In its order filed on November 8, the district court found that the Committee was a subcommittee of the Board, and not an advisory committee, and therefore was not a public body as defined in the Open Meetings Act. The court further found that the Committee meetings were not required to be open to the public because there was not a quorum of the Board present at the Committee meetings and because the Committee did not hold hearings, make policy, or take formal action on behalf of the Board. The court denied all relief requested by Koch, and judgment was entered in favor of the Lower Loup NRD.

Koch appeals.

## IV. ASSIGNMENTS OF ERROR

Koch assigns numerous errors to the district court, which ultimately boil down to whether or not the district court erred in concluding that the Committee was not a public body subject to the requirements of the Open Meetings Act.

## V. STANDARD OF REVIEW

[1,2] An appellate court reviews actions for relief under Nebraska's Open Meetings Act in equity because the relief sought is in the nature of a declaration that action taken in violation of the act is void or voidable. *Salem Grain Co. v. City of Falls City*, 302 Neb. 548, 924 N.W.2d 678 (2019). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both

fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. *Id*. But when credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another. *Id*.

[3] Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Id*.

## VI. ANALYSIS

### 1. NEBRASKA'S OPEN MEETINGS ACT IN GENERAL

"Every meeting of a public body shall be open to the public . . . except as otherwise provided by the Constitution of Nebraska, federal statutes, and the Open Meetings Act." § 84-1408. Section 84-1409 defines "[p]ublic body" as follows:

(1)(a) Public body means (i) governing bodies of all political subdivisions of the State of Nebraska, (ii) governing bodies of all agencies, created by the Constitution of Nebraska, statute, or otherwise pursuant to law, of the executive department of the State of Nebraska, (iii) all independent boards, commissions, bureaus, committees, councils, subunits, or any other bodies created by the Constitution of Nebraska, statute, or otherwise pursuant to law, (iv) all study or advisory committees of the executive department of the State of Nebraska whether having continuing existence or appointed as special committees with limited existence, (v) advisory committees of the bodies referred to in subdivisions (i), (ii), and (iii) of this subdivision, and (vi) instrumentalities exercising essentially public functions; and

(b) *Public body does not include (i) subcommittees of such bodies unless a quorum of the public body attends a subcommittee meeting or unless such subcommittees are holding hearings, making policy, or taking formal action*

*on behalf of their parent body*, except that all meetings
of any subcommittee established under section 81-15,175
[to evaluate projects and proposals seeking allocations
from the Nebraska Environmental Trust Fund and/or the
Nebraska Environmental Endowment Fund] are subject to
the Open Meetings Act, and (ii) entities conducting judi-
cial proceedings unless a court or other judicial body is
exercising rulemaking authority, deliberating, or deciding
upon the issuance of administrative orders.

(Emphasis supplied.) "[N]o public body shall designate itself
a subcommittee of the whole body for the purpose of circum-
venting the Open Meetings Act." § 84-1410(4).

The public has the right to attend and speak at meetings of
the public bodies. § 84-1412(1). Any person in attendance may
videotape or record all or any part of a meeting of the public
body. *Id.* However, the public body may make and enforce rea-
sonable rules and regulations regarding the conduct of persons
attending, speaking at, videotaping, or recording its meetings.
§ 84-1412(2). A body may not be required to allow citizens to
speak at each meeting, but it may not forbid public participa-
tion at all meetings. *Id.* No public body shall, for the purpose
of circumventing the Open Meetings Act, hold a meeting in a
place known by the body to be too small to accommodate the
anticipated audience. § 84-1412(4).

Finally, § 84-1414(1) provides in relevant part:

Any motion, resolution, rule, regulation, ordinance, or
formal action of a public body made or taken in violation
of the Open Meetings Act shall be declared void by the
district court if the suit is commenced within one hundred
twenty days of the meeting of the public body at which
the alleged violation occurred.

Koch filed his original complaint within 120 days of all meet-
ings at issue.

## 2. Board Is Public Body

In 1969, the Nebraska Legislature created the State's natu-
ral resources districts. See Neb. Rev. Stat. § 2-3201 (Reissue

2012). The Legislature has declared that natural resource districts are political subdivisions of the State. See Neb. Rev. Stat. § 2-3213 (Reissue 2012). Each district is governed by a board of directors. *Id.* Accordingly, the Board is a "public body," and its meetings are subject to the Open Meetings Act. See §§ 84-1408 and 84-1409(1)(a)(i). See, also, Neb. Rev. Stat. § 2-3219 (Reissue 2012) (notice of all board meetings shall be given pursuant to § 84-1411 of Open Meetings Act).

### 3. Is Committee a Subcommittee?

We must determine whether or not the Committee is a subcommittee of the Board; the district court concluded it was. If the Committee is a subcommittee, then its meetings are not subject to the Open Meetings Act unless a quorum of the public body attends a subcommittee meeting or unless it is holding hearings, making policy, or taking formal action on behalf of its parent body. See §§ 84-1408 and 84-1409.

### (a) Applicable Law

[4-7] Although the Open Meetings Act does not define "subcommittee," a subcommittee is generally defined as a group within a committee to which the committee may refer business. *City of Elkhorn v. City of Omaha*, 272 Neb. 867, 725 N.W.2d 792 (2007) (citing Black's Law Dictionary 290 (8th ed. 2004)). In *City of Elkhorn*, members of the Omaha City Council attended informational sessions prior to a public meeting regarding the annexation of Elkhorn, Nebraska; there was no quorum of council members present at any one of the informational sessions. The Nebraska Supreme Court held that informational sessions attended by a subgroup of the city council, consisting of less than a quorum which, according to city charter, had no power to make any determination or effect any action, were not meetings of a public body under the Open Meetings Act. The Supreme Court noted that the purpose of the Open Meetings Act is to prevent "the formation of public policy . . . in secret." § 84-1408. The court then stated:

But it does not require policymakers to remain ignorant of the issues they must decide until the moment the public is invited to comment on a proposed policy. The public would be ill served by restricting policymakers from reflecting and preparing to consider proposals, or from privately suggesting alternatives. See *Hispanic Educ. Com. v. Houston Ind. Sch. Dist.*, 886 F. Supp. 606 (S.D. Tex. 1994) [(actual decision to appoint specific person formally to position of superintendent was undisputedly made at open meeting in full compliance with Texas law, and earlier discussions of that person's candidacy for position were not final decisions and thus not illegal)]. By excluding nonquorum subgroups from the definition of a public body, the Legislature has balanced the public's need to be heard on matters of public policy with a practical accommodation for a public body's need for information to conduct business.

Also, other courts have declined to apply public meeting laws to nonquorum gatherings intended to obtain information or voice opinions. See, e.g., *id.*; *Freedom Newspapers v. Orange Cty.*, 6 Cal. 4th 821, 863 P.2d 218, 25 Cal. Rptr. 2d 148 (1993) [(committee composed solely of board members numbering less than quorum of board was excluded from open meeting requirements; committee's function was to review various matters related to business of board and to make recommendations to full board for action; full board considered committee's recommendations in public meetings, at which time there was opportunity for full public discussion and debate; and committee did not have any decisionmaking authority)]; *Delaware Solid Waste Authority v. News-Journal*, 480 A.2d 628 (Del. 1984) [(standing committee composed solely of directors numbering less than quorum of directors for Delaware Solid Waste Authority (Authority) are not subject to open meetings laws; standing committee investigated Authority operations and then reported its

conclusions and recommendations, if any, to full board; all meetings of Authority, where work of committees is discussed, are open to public; after debate, Authority as whole publicly renders policy decision, and publicly takes steps to implement it; and throughout its meetings, Authority is open to public questions, comment, and criticism)]; *Lyon v. Lake County*, 765 So. 2d 785 (Fla. App. 2000) [(when committee has been established for and conducts only information gathering and reporting, activities of that committee are not subject to open meetings laws)]; *Mason v. Vision Iowa Bd.*, 700 N.W.2d 349 (Iowa 2005) [(committee not subject to open meetings laws; committee did not have policymaking duties, but, rather, it made recommendations and then board made ultimate decision on course of action to be taken)]. It is true that we have been concerned with a public body's perfunctorily approving a decision in a public meeting that was apparently reached in a private meeting. "The prohibition against decisions or formal action in a closed session also proscribes . . . rubberstamping or reenacting by a pro forma vote any decision reached during a closed session." *Grein v. Board of Education*, 216 Neb. 158, 168, 343 N.W.2d 718, 724 (1984). But *Grein* is distinguishable on two counts.

First, *Grein* involved a closed session of a full school board. Obviously, a private meeting of a full public body, or a quorum thereof, raises the concern that the members will reach consensus on a matter of public concern out of the public's view. See, also, *Johnson v. Nebraska Environmental Control Council*, 2 Neb. App. 263, 509 N.W.2d 21 (1993).

Second, the school board in *Grein* immediately voted on an agenda item after a closed session, without further discussion or deliberations. "The necessary inference is that the vote during the reconvened open session was the extension, culmination, and product of the closed

session." 216 Neb. at 167-68, 343 N.W.2d at 724. Here, Omaha informed the public of all relevant facts supporting the annexation, and the public had full opportunity to voice its concerns.

*City of Elkhorn v. City of Omaha*, 272 Neb. 867, 881-82, 725 N.W.2d 792, 806 (2007). And the Supreme Court noted that the Omaha City Council did not reach a final decision on the annexation until it had received the public's input on the plan.

In addressing the claim in *City of Elkhorn* that under § 84-1410(4), "no public body shall designate itself a subcommittee of the whole body for the purpose of circumventing the Open Meetings Act," the Nebraska Supreme Court stated:

We need not decide whether, under this section, a subcommittee need be composed of the entire body or a quorum before it could circumvent the [Open Meetings] Act, because here, the evidence shows Omaha did not attempt to circumvent the [a]ct. As noted, Omaha gave the public access to the same information as the council received and an opportunity to be heard. We conclude that the informational sessions of less than a quorum of the Omaha City Council members did not constitute a public meeting under the [a]ct.

272 Neb. at 883, 725 N.W.2d at 807.

### (b) Trial Evidence

At the bench trial, Russell Callan, the assistant general manager of the Lower Loup NRD, testified and explained the project proposal process as follows: When someone applies for a project approval to the Lower Loup NRD, the application is initially submitted to staff. "[S]taff . . . usually tries to sit with folks and review it to make sure that . . . it's warranted, that it's even an NRD activity," and to determine the appropriate committee for the proposal. Staff helps "participant[s] accumulate the correct information" and makes sure that "they get all their information put together so when they come to the committee they can make a presentation to the committee."

After being presented to the Committee, the Committee looks through the proposal and then votes to send it to the Board as "an approval request or recommendation" or "a denial recommendation." Callan affirmed that if the Committee believes that it needs more information or further study of the matter, it can refer that proposal back to staff for further development. Regardless of whether the Committee recommends approval or denial, all proposals are presented to the entire Board. On cross-examination, Callan stated that "there's usually discussion" on all proposals that are brought to the Board. Callan agreed that the Board usually follows the recommendation of the Committee.

According to Callan, neither staff nor the Committee has any absolute authority to approve or deny a project proposal. The "Board of directors has the authority to . . . approve or deny projects." The Board, not the Committee, is the governing body of the Lower Loup NRD. Callan agreed that the Committee is "a committee underneath [or] a subgroup" of the Board; the Committee does not involve a quorum of the Board and does not have any authority to act on behalf of the Board. He affirmed that the role of the Committee is to consider information and make recommendations to the Board for a final decision.

Callan was present at the Committee meetings on June 17 and July 15, 2014. Callan testified that "[d]uring the [C]ommittee meeting, staff takes minutes and then records them and submits them through the agenda process to the . . . full [B]oard." There were a total of eight directors present at the June 17 meeting (six members of the Committee and two other directors not on the Committee), and there were seven directors present at the July 15 meeting. There are 21 directors on the Lower Loup NRD, so 11 directors are needed for a quorum; there was no quorum at the Committee meetings on either June 17 or July 15. According to Callan, the Committee does not hold hearings and no hearings were held at either the June 17 or July 15 meeting. Callan's definition of a hearing is

"a formal process that a governing body goes through to take testimony and . . . information from . . . a person or the general public . . . for a certain function or need," weighing both evidence and testimony. Callan denied that the Committee holds hearings where it takes sworn testimony or public information of that nature. Callan also denied that the Committee made any policy binding upon the Lower Loup NRD or that it took any formal action on behalf of the Board.

Callan acknowledged that Koch was present at the Committee meeting on June 17, 2014, but was "very agitated that he was not able to enter the meeting right away." Koch was able to present his proposal regarding the dam, and "[i]t was recommended to go back to staff for review." The meeting minutes do not reflect that Koch was able to present his proposal. Rather, the minutes reflect that the Committee voted to table the proposal until July, "pending the Bredthauer proposal be[ing] submitted to staff in advance of the meeting, allowing sufficient time to review the proposal."

Callan acknowledged that Koch was also present at the Committee meeting on July 15, 2014, and gave a presentation regarding the dam proposal. Members of the Committee were able to ask questions and have interaction with Koch, and the members had "concerns about permitting, engineering and design, [and] the fact that it's a private structure, not a public structure." The Committee's recommendation was to deny the request. Callan acknowledged that the recommendation would include a presentation of the findings and studies and the concerns that were developed at that meeting.

Koehlmoos, the general manager of the Lower Loup NRD, was called as a rebuttal witness by Koch. Koch had Koehlmoos read a portion of the minutes from the June 26, 2014, meeting of the Board, which state:

> Koehlmoos said, that at the June Committee meeting, he had said he would review proposals to see if there were any changes from original discussions with Bredthauer; and if there was nothing new and Koch was asking for the

same things as in the past, Koehlmoos said he probably would not be taking the information forward. Koch then asked Koehlmoos if that meant that Koehlmoos could decide if the proposal went forward to the Committee. Koehlmoos responded, no, that there were "a number of ways to be put on any agenda." Koehlmoos said that the chairman of the Board can request an agenda item be added or that two members of the Board can ask that an agenda item be added. But that as the preparer of the agenda, Koehlmoos said it was his job to "look through the information, and if its information that's already been covered and nothing significantly has changed, because of time of directors, . . . I don't report the same thing over and over and over again." He further said, "So, I think, per my statement, that . . . I looked to see if there were changes from the original discussion and there were none, so, you know, it didn't go forward." Koehlmoos was also asked who had the authority to place things on the agenda for the Board. He responded, "I do as far as the preparer of the agenda, or I can be directed to add an agenda item by the chair" or by "two or more . . . members on the NRD Board."

Koehlmoos stated that if something "doesn't meet our [Lower Loup] NRD authority, I probably will not take it before the [C]ommittee," but "it's not to say that it can't get to the [C]ommittee by way of either the chairman or . . . a number of directors that wish [it] to be placed there." At the Committee meetings, "ideas are brought, discussion is made" and "we do discuss the item in greater detail than allowable during the public [meeting of the Board]." The Committee is a "subcommittee or a committee of a non-quorum group that are allowed some flexibility in asking questions and throwing out ideas and maybe even doing some discussions on the items to come to what then is carried, you know, a recommendation to take to the [B]oard."

Koch testified that he attempted to present the dam proposal for Bredthauer, whose dam washed out in 2010 (Bredthauer

asked Koch for assistance in building his dam). Koch said he attempted to get the proposal on the agenda for the Committee meeting on June 17, 2014, but was told that it would not be on the agenda; however, the Committee meeting agenda had the proposal listed.

Koch said he was refused entry to the Committee meeting on June 17, 2014, for 15 minutes, but was then told he could go in because it was a "public meeting." He could not record the entire meeting because of the late entry. He claimed that the meeting room was too small for the number of people in attendance. (Bredthauer also testified that the room was "cramped.") According to Koch, a discussion regarding the "CART" agenda item was in progress when Koch entered the meeting and "specific dialogue made me understand that there were decisions being formulated" in the Committee that "were not represented entirely" in front of the Board. Koch wants every decision of the Committee that was not public—"[a]nything that I wasn't allowed to hear"—to be declared void.

When the Committee reached the agenda item for the dam proposal on June 17, 2014, Koch said he was told that the proposal was "on the agenda to decide whether [it was] going to [be] on the agenda." (An audio recording of the meeting made by Koch was received into evidence and reveals that the dam proposal was listed on the agenda so that the Committee could decide whether it wanted to discuss the proposal again. The Committee noted that the proposal had been brought to the Board and voted against in the past, so if there was nothing new in the proposal, there was no reason to look at it again. Because Koch had not submitted the allegedly new proposal to staff for review prior to the Committee meeting, the issue was tabled until July in order to allow the review to occur.) Koch sought to have the proposal put on the agenda for the Committee meeting in July, and he noted that the meeting date had been changed from July 17 to July 15. He said he was told he could not record the Committee meeting on July 15

because the Committee does not go by the Open Meetings Act. Koch stated that the meeting room for the Committee meeting in July was again too small. According to Koch, he presented the dam proposal for 2 hours at the Committee meeting in July, but at the Board meeting in July, only 4 or 5 minutes were taken to summarize his 2-hour presentation; the Board voted to deny any funding for the dam proposal.

Koch stated that votes were taken at the Committee meetings in June and July. He further stated that each of the agenda items for the Board meeting in July took 2 to 5 minutes to decide, whereas discussion at the Committee meeting took 30 to 45 minutes. Koch believes what the Committee does is "rubberstamped" by the Board.

### (c) Our Decision

Although there is evidence in the record that staff and/or the Committee had stated that the Committee meeting in June was an "open meeting" and was "public," their personal descriptions of the meeting is not controlling for purposes of determining whether the Committee is a subcommittee subject to the Open Meetings Act.

Keeping in mind the evidence and the legal principles set forth previously, we conclude that the Committee was a subcommittee of the Board and was not subject to the Open Meetings Act at either its June or July 2014 meetings. Neither of those meetings of the Committee had a quorum of the Board in attendance. And as testified to by Callan, the Committee does not hold hearings, make policy, or take formal action on behalf of the Board.

According to the testimony of Callan and Koehlmoos, ideas are brought and discussion is had at the Committee meetings; the Committee considers the information and makes recommendations to the Board for a final decision. According to Callan, neither staff nor the Committee has any absolute authority to approve or deny a project proposal. The Board "has the authority to . . . approve or deny projects." The

Board, not the Committee, is the governing body of the Lower Loup NRD. We have reviewed the meeting minutes of the Committee and the Board, as well as listened to the various audio recordings made by Koch that were received into evidence, and we note that no final decisions were made at the Committee meetings; the Committee only voted on what recommendations to make to the Board on the various proposals. The Board then held a public meeting, where the public was allowed to comment, further discussion was had, and a final decision was made.

As the Nebraska Supreme Court stated in *City of Elkhorn v. City of Omaha*, 272 Neb. 867, 881, 725 N.W.2d 792, 806 (2007), the Open Meetings Act "does not require policymakers to remain ignorant of the issues they must decide until the moment the public is invited to comment on a proposed policy. The public would be ill served by restricting policymakers from reflecting and preparing to consider proposals, or from privately suggesting alternatives." The court also recognized that "other courts have declined to apply public meeting laws to nonquorum gatherings intended to obtain information or voice opinions." *Id.* The *City of Elkhorn* court cited authority from other states which held that committees that did not have any decisionmaking authority, but reviewed matters and made recommendations to the full board for final decision (after full public discussion and debate) were not subject to the Open Meetings Act. That is exactly what occurred in the instant case. The Committee reviewed projects and proposals and then made recommendations to the Board. The Board had a public meeting, where the public was allowed to comment, further discussion was had, and then a final decision was made.

Although Koch contends that the Committee's decision is "rubberstamped" by the Board, we disagree. Unlike in *Grein v. Board of Education*, 216 Neb. 158, 343 N.W.2d 718 (1984), where the school board immediately voted on an agenda item after a closed session without further discussion

or deliberations, the Board in the instant case had a public meeting more than a week after the Committee meeting. At the public meeting, the public was allowed to comment, further discussion was had, and then a final decision was made. Just like in *City of Elkhorn, supra*, and the cases cited therein, the Board did not reach a final decision on issues until it had allowed and received the public's input.

For the sake of completeness, we note that the district court also concluded that the Committee was not an advisory committee. This finding was made in response to our previous opinion where we noted that neither party nor the district court had addressed whether the Committee was an advisory committee. See *Koch v. Lower Loup NRD*, No. A-15-559, 2016 WL 7209828 (Neb. App. Dec. 13, 2016) (selected for posting to court website). However, that observation was made solely to point out that the record on summary judgment lacked sufficient information to determine exactly what the Committee's role was with respect to actions taken by the Board; the record before this court now sufficiently establishes that the Committee qualifies as a subcommittee under § 84-1409(1)(b) and is therefore not a public body subject to the Open Meetings Act. That being the case, it follows that the Committee cannot also be an advisory committee, which is specifically identified as a public body subject to the Open Meetings Act. See § 84-1409(1)(a)(v).

## VII. CONCLUSION

Because we have determined that the Committee was not functioning as a public body at the meetings complained of, and thus not subject to the requirements of the Open Meetings Act, we affirm the district court's denial of all relief requested by Koch and its judgment in favor of the Lower Loup NRD.

Affirmed.