# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ROBERT E. VANELLA, on behalf of  
THE DELAWARE CALL,

           Appellant,

    v.

CHRISTINA DURAN, In her official  
Capacity as FOIA Coordinator for  
DELAWARE DEPARTMENT OF  
SAFETY AND HOMELAND  
SECURITY, DELAWARE STATE  
POLICE,

           Appellee.

C.A. No. K24A-02-002

Submitted: October 1, 2024  
Decided: December 23, 2024

## OPINION

Dwayne Bensing, Esquire, ACLU Foundation of Delaware, Inc., Wilmington, Delaware, *Attorney for the Appellant.*

Joseph Handlon, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, Delaware, *Attorney for the Appellee.*

**CLARK, R.J.**

1

Robert E. Vanella appeals a decision of the Chief Deputy of the Department of Justice. He does so on behalf of The Delaware Call ("Delaware Call"), which is an independent news agency. Delaware Call made a Freedom of Information Act ("FOIA") request seeking information and documents from the Delaware State Police ("DSP"). DSP, in turn, denied the request in its entirety. Delaware Call then petitioned the Chief Deputy to challenge that denial, and the Chief Deputy upheld DSP's positions.

The Court must now consider Delaware Call's FOIA requests that seek seven categories of allegedly public records. As explained below, DSP met its burden of denying some of the requests, but not all. As a result, the Chief Deputy's decision is affirmed, in part, and reversed, in part.

## I.  BACKGROUND

Delaware Call is an "independent investigative journalism news publication committed to increasing government transparency."[1] Plaintiff Robert E. Vanella is Delaware Call's coordinating editor.[2] He sent a FOIA request on behalf of Delaware Call to DSP on October 3, 2023.[3] In it, Delaware Call requested certain information for the purposes of "identify[ing], track[ing], and report[ing] on officers who may have engaged in misconduct."[4] Specifically, it requested the following:

    (1) the names of all certified law enforcement officers;
    (2) the current annual salary of each certified officer;
    (3) the current employing state agency and rank of each certified officer;
    (4) the past employers and job titles of each certified officer;
    (5) resumes of each certified officer;
    (6) a list of all formerly certified officers and their current status; and

---

[1] Opening Br. at 3 (D.I. 12).
[2] *Id.*
[3] *Id.*
[4] *Id.*

(7) the age, sex, and race of each certified officer.[5]

DSP formally denied the entire request. It contended that DSP does not maintain any of the requested records in the format requested, and that even if it did, the requested information falls somewhere within three of FOIA's enumerated exceptions. In lieu of the requested salary information, DSP provided Delaware Call a weblink to "Open the Books". That is a non-governmental third-party website that purports to identify salary information for all State of Delaware employees. DSP alternatively contended that its troopers' names, rank, past employment, and job titles are exempt under 29 *Del. C.* § 10002(o)(17)a(5)(A) (hereinafter the "Safety Exception"). DSP likewise relied upon 29 *Del. C.* § 10002(o)(1) (hereinafter the "Personnel File Exception") when refusing to produce trooper resumes in its possession. Finally, DSP contended that former officer certification status and demographic information is exempt under both the Personnel File Exception and a separate FOIA exception that incorporates the Law Enforcement Officer Bill of Rights ("LEOBOR").[6]

The parties discussed potential middle ground after DSP denied the requests. Namely, DSP inquired whether Delaware Call would accept general demographic statistics without trooper names in lieu of the specific information requested. Delaware Call responded that it would accept demographic information regarding all officers in an anonymized format if DSP would segregate the information by a "unique ID or position number," and would otherwise produce "complete data

---

[5] D.I. 12, at 3.

[6] D.I. 12, at 5. As to LEOBOR, DSP relies on 29 *Del. C.* § 10002(o)(6). That paragraph exempts from public disclosure records specifically exempted by statute or common law, which DSP contends incorporates 11 *Del. C.* c. 92, also known as LEOBOR.

profiles."[7] DSP refused Delaware Call's invitation believing it to be an effort to link trooper names to the troopers' corresponding demographic information.[8]

Given DSP's denial, Delaware Call petitioned the Chief Deputy pursuant to 29 *Del. C.* §10005(e) for a review of the decision.[9] DSP reiterated its prior objections before the Chief Deputy and contended that the "Open the Books" weblink sufficiently responded to Delaware Call's request for salary information. DSP also included two affidavits: one from its Public Information Officer, India Sturgis, and a second from its Director of Human Resources, Captain James P. Doherty.[10] The affidavits contained, *inter alia*, recitations alleging that disclosing the demographic information of DSP officers created officer safety risks and would violate their personal privacy interests.[11] Germanely, Captain Doherty's affidavit acknowledged that "DSP maintains computer systems that include trooper names, ranks, assignments and pedigree information."[12] Captain Doherty further recited, however, that the system contains highly confidential information which DSP treats as the personnel files of its employees.[13]

The Chief Deputy then issued his decision and determined that DSP had not violated FOIA. First, he reasoned that DSP's denial of access to the requested information was proper because the requested list of all certified DSP trooper names is exempt from FOIA disclosure under the Safety Exception. That exception applies

---

[7] D.I. 12, at 6.

[8] In DSP's November 16, 2023 Response to the FOIA Request, DSP contended that "[t]his communication confirmed to DSP that Petitioner intends to reverse engineer the information provided to link biological and other personally identifying information to each trooper." Notice of Appeal, Ex. 6 at n.2 (D.I. 1).

[9] *See* 29 *Del. C.* §10005(e) (providing that, "[a]ny citizen may petition the Attorney General to determine whether a violation of this chapter has occurred or is about to occur").

[10] D.I., Ex. 7–8 [hereinafter the Court cites to Ms. Sturgis' affidavit as "Sturgis Affidavit at . . ." and Captain Doherty's affidavit as "Doherty Affidavit at . . ."].

[11] D.I. 2 at 6.

[12] Doherty Affidavit at ¶ 3.

[13] *Id.*

to certain "records which, if copied or inspected, could jeopardize the security of any structure owned by the State or any of its political subdivisions, or could facilitate the planning of a terrorist attack, or could endanger the life or physical safety of an individual."[14] The Chief Deputy reasoned that the requested information (1) comes from "portions of records assembled, prepared or maintained to prevent, mitigate, or respond to criminal acts, the public disclosure of which would have a substantial likelihood of threatening public safety," and (2) implicates "[s]pecific and unique vulnerability assessments or specific and unique response or deployment plans, including compiled underlying data collected in preparation of or essential to the assessments or to the response deployment plans."[15]

When applying the Safety Exception, the Chief Deputy relied upon the fact that "DSP's primary objectives include assessing vulnerable areas and deploying response plans to prevent, mitigate, or respond to criminal activity, and the identities of the officers, including those that are undercover or working in intelligence operations, are essential to these response and deployment plans."[16] He explained that because the remainder of the requested items "hinge on releasing the identities of the DSP troopers," DSP justifiably denied the remainder of the request.[17] The Chief Deputy's decision did not cite any specific facts to support his finding that the Safety Exception applied to the requested list of certified officers' names, however. Rather, he cited alternative sources of information identified by DSP in lieu of the requested records.[18] On balance, the Chief Deputy declined to analyze whether DSP possessed the records, or whether other exceptions cited by DSP exempted them from disclosure.

---

[14] Del. Op. Att'y Gen. 24-IB01, WL 270842, at *3 (2024) (quoting 29 *Del. C.* § 10002(o)(17)a).
[15] *Id.* (quoting 29 *Del. C.* §§ 10002(o)(17)a(5)–10002(o)(17)a(5)(A)).
[16] *Id.*
[17] *Id.*
[18] *Id.* at 4.

## II.    APPLICABLE STANDARDS

Section 10005 of Title 29 of the Delaware Code provides the process to challenge alleged FOIA violations.  First, Subsection 10005(b) provides that an aggrieved requester can petition the Chief Deputy of the Department of Justice to challenge a denial.[19]  An aggrieved party then has the right to appeal the Chief Deputy's decision to the Superior Court.[20]

The Superior Court's review of the Chief Deputy's FOIA decision is an anomaly in administrative law.  On one hand, Subsection 10005(b) defines the Superior Court's review as "on the record" and places the burden on the agency to justify the denial.[21]  On the other hand, administrative appeals of case decisions typically follow adversarial hearings that produce a developed record.  There are no adversarial proceedings in the FOIA context, however.  In their absence, the statute leaves many important questions unanswered.  They include, what is the scope of the record to be reviewed and how much deference is due the agency's cited reasons for denial?

The answer to the first question, the scope of the record to be reviewed, flows from the nature of the proceedings below.  Namely, the record includes (1) the reasons the agency provides the requester for the denial, (2) the reasons the agency proffers to the Chief Deputy for the denial, and (3) any affidavits that the agency submits to support its denial.  The Delaware Supreme Court has encouraged, and in fact required, the use of affidavits by an agency as a partial counterbalance to the one-sided nature of FOIA proceedings.[22]  There is no escaping the conclusion,

---

[19] 29 *Del. C.* § 10005(b).
[20] *Id.*
[21] *Id.*
[22] *Jud. Watch, Inc. v. Univ. of Delaware*, 267 A.3d 996, 1012  (Del. 2021).

however, that FOIA, as currently structured, requires the Superior Court to provide considerable deference to an agency's stated reasons for denial.

The answer to the second question, the burden of proof below and on appeal, also has no parallel in administrative law. Namely, in a FOIA appeal, the Superior Court cannot perform a substantial evidence review because there was no adversarial proceeding from which to develop a traditional record. The Delaware Supreme Court addressed this difficulty, in part, in *Judicial Watch, Inc. v. University of Delaware*.[23] There, it recognized a "requirement that the public body's statement be made under oath [to help] address the statute's inherent information balance."[24] That defines the "evidence" to be examined as the agency's one-sided affidavits. It follows logically that such "evidence" must be considered in the context of the FOIA exceptions relied upon by the agency. In addition to the guidance provided in *Judicial Watch*, FOIA's requirement that the Superior Court perform an "on the record" review prohibits the Court from considering new facts or arguments that were not presented below.[25]

In turn, the result in Delaware Call's appeal depends on the answers to two substantive questions: whether DSP has relevant records in its possession, and whether a FOIA exception applies. Again, when answering the first question, the Court must provide significant, in fact controlling, deference to DSP's representations regarding whether it possesses relevant records. As to the second question, the Court must apply a *de novo* review when interpreting FOIA's statutory

---

[23] 267 A.3d 996 (Del. 2021).
[24] *Id*. at 1011.
[25] *See Rudenberg v. Chief Deputy Att'y Gen. of Dep't of Just.*, 2016 WL 7494900, at *1 (Del. Super. Dec. 30, 2016) (recognizing that it is not appropriate for the Superior Court to consider new facts raised by a party in an "on the record" FOIA appeal).

exceptions.[26] Nevertheless, the Court must also provide considerable deference to DSP's justifications for relying on FOIA's exceptions.

When the Court interprets a statute such as FOIA, it must "determine and give effect to legislative intent."[27] If the statute's language is clear and unambiguous, then the statute's plain meaning controls.[28] On the other hand, if the statute's language is ambiguous, it should be interpreted to promote its stated purpose and harmonize it with the balance of the statute's scheme.[29] In the FOIA context, the statute's enumerated exceptions create a barrier to the public's right to access information and must be narrowly construed.[30]

Finally, the Court owes no deference to the Chief Deputy's interpretations of the statutes in question.[31] Nor do the Department of Justice's FOIA opinions control the Court's analysis. Those opinions nevertheless provide helpful insight because they represent the Department of Justice's considerable efforts to provide guidance for FOIA requests. They also deserve considerable weight given the absence of fully developed Delaware case law.

---

[26] *Delaware Dep't of Nat. Res. & Envtl. Control v. Sussex Cnty.*, 34 A.3d 1087, 1090 (Del. 2011); *Evans v. State*, 212 A.3d 308, 313 (Del. Super. 2019) (applying *de novo* review to the Court of Common Pleas' statutory interpretation).

[27] *Jud. Watch*, 267 A.3d at 1003–4.

[28] *Id.*

[29] *Id.*

[30] *See Flowers v. Off. of the Governor*, 167 A.3d 530, 545 (Del. Super. 2017) (providing that "exemptions are to be narrowly construed and . . . FOIA is to be construed to further open access to records"); *see also ACLU of Del. v. Danberg*, 2007 WL 901592, at *3 (Del. Super. March 15, 2007); *cf. Chem. Ind. Council of Del. V. State Coastal Zone Indus. Control Bd.*, 1994 WL 274295, at *7 (Del. Ch. May 19, 1994) (providing that "FOIA is liberally construed to assure open meetings, and FOIA's closed 'session' exceptions are strictly interpreted to limit nonpublic meetings"); *Del. Solid Waste Authority v. News-Journal Co.*, 480 A.2d 628, 631 (Del. Super. July 9, 1984) (explaining that "[c]onsistent with … [FOIA's] salutary purposes, open meeting laws are liberally construed, and closed session exceptions within these statutes are strictly interpreted to limit nonpublic meetings").

[31] *Delaware Dep't of Nat. Res. & Envtl. Control v. Sussex Cnty.*, 34 A.3d 1087, 1090 (Del. 2011)

## III.   ANALYSIS

The simplest way to address Delaware Call's requests is to resolve them sequentially.  The Court will first discuss a public body's obligations under FOIA.  It will then address the two exceptions that DSP relied upon when denying Delaware Call's seven requests.  Resolution of the seven requests will then follow in series with the Court's examining whether DSP possesses or controls the records, and then determining whether one of the two exceptions exempt the records if DSP possesses or controls them.

### A. Public Bodies' Obligations Under FOIA

When a public body withholds requested records after invoking one of FOIA's statutory exceptions, it "must provide the requester its 'reasons' for doing so."[32] Despite FOIA's stated policy goals of transparency and accountability, the General Assembly set a low bar for a public body's denial of a request.  Namely, unlike public transparency statutes in many other jurisdictions, Delaware's FOIA expressly prohibits a public body from providing a privilege log or an index that specifies why each record was withheld.[33]  FOIA simultaneously, and in partial inconsistency, requires the public body to provide its reasons for denying a request when seeking to satisfy its burden of proof.

In *Flowers v. Office of the Governor*,[34] the Superior Court addressed this tension.  There, the court examined the sufficiency of the Governor's reasons for withholding records under one of FOIA's exceptions.  When doing so, the court

---

[32] 29 *Del. C.* § 10003(h)(2) (providing that "[i]f the public body denies a request in whole or in part, the public body's response shall indicate the reasons for the denial").

[33] *Flowers*, 167 A.2d at 542; 29 *Del. C.* § 10003(h)(2) (providing that "[t]he public body shall not be required to provide an index, or any other compilation, as to each record or part of a record denied").

[34] 167 A.3d 530 (Del. Super. 2017).

attempted to reconcile federal FOIA precedent regarding the sufficiency of a public body's reasons for denial with Delaware's FOIA provision that prohibits producing logs for that purpose. Federal precedent largely requires a public body denying a FOIA request to produce an index, frequently known as a *Vaughn* Index.[35] That serves as a useful tool to specify the reasons for why an agency declines to produce the record. In contrast, Delaware's 29 *Del. C.* § 10003(h)(2) statutorily prohibits the use of one.[36] The *Flowers* court appreciated the difficulty in squaring FOIA's general purpose of promoting governmental transparency and accountability with Paragraph 10003(h)(2)'s express rejection of a Delaware version of a *Vaughn* Index.[37]

When grappling with this difficulty, the *Flowers* court rested upon the unambiguous language of Paragraph 10003(h)(2). It reasoned as follows:

> [h]armonizing [Paragraph] 10003(h)(2)'s bar on indices with [Section] 10005's burden allocation, it is clear to the Court that the General Assembly contemplated that a public body could meet its burden of

---

[35] The *Flowers* court closely examined the U.S. Court of Appeals for the District of Columbia's decision in *Vaughn v. Rosen*. The *Vaughn* court addressed the issue of specificity in a governmental body's reason for denying a FOIA request. It concluded that it would "simply no longer accept conclusory and generalized allegations of [FOIA] exemptions . . .," and instead require the Government to produce an index detailing with specificity, the reasons for withholding requested records. *Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973). This requirement served as the inception for what became known as the "*Vaughn* Index." The *Vaughn* Index is a "system of itemizing and indexing that would correlate statements made in the [public body's] refusal justification with the actual portions of the [records]." *Id*. at 827. Specifically, it details why each record, or portion thereof, was withheld. It also recognizes inherent imbalances in the FOIA request decision process—that a requestor cannot review the records in dispute. Despite the fact that such a procedural requirement may impose a substantial burden on a governmental body, nearly all federal courts have in some fashion implemented the *Vaughn* Index. *Flowers*, 167 A.3d at 547–48. Federal courts favor the *Vaughn* Index "because it provides them with an opportunity to assess why each [record] was specifically withheld before resorting to a burdensome *in camera* review." *Id*. at 548.

[36] *See* 29 *Del. C.* § 10003(h)(2) (providing "[i]f the public body denies a request in whole or in part, the public body's response shall indicate the reasons for the denial. The public body *shall not* be required to provide an index, or any other compilation, as to *each record or part of a record denied*.") (emphasis added).

[37] *Flowers*, 167 A.3d at 548.

10

proof without resorting to the production of an index or compilation of each document withheld under each FOIA exemption. It is also clear to the Court that the General Assembly contemplated that the Chief Deputy would be able to fulfill her responsibility to weigh the sufficiency of those reasons in determining whether a FOIA violation had occurred, and, in turn, that this Court be able to review the Chief Deputy's decision without the considerable benefit of a *Vaughn* Index.[38]

With that in mind, the *Flowers* court recognized that an agency's statement of the reasons for denial, coupled with affidavits, could satisfy the public body's burden.[39] The court recognized that a public body would otherwise find itself in a *Catch-22* of being prohibited from producing an index while being unable to meet its burden without one.[40] The *Flowers* court's guidance does not erase the tension between FOIA's prohibition on indices and a public body's burden of proof when denying access to its records. But, it correctly recognizes that there must be *some* factual basis for the denial.

After the Superior Court issued the *Flowers* decision, the Delaware Supreme Court provided mandatory direction on the burden of proof issue in *Judicial Watch, Inc. v. University of Delaware*.[41] In *Judicial Watch*, the University of Delaware denied FOIA requests by invoking an exception.[42] The Supreme Court suggested, without expressly holding, that an affidavit from the agency is necessary to meet the burden of proof in all but the clearest of circumstances.[43] Intuitively, the Supreme Court explained that "unless it is clear on the face of the request that the demanded records are not subject to FOIA, satisfaction of Subsection 10005(c)'s burden of proof requires a statement made under oath."[44] To that end, the Court required a

---

[38] *Id.* at 549.
[39] *Id*.
[40] *Id*.
[41] 267 A.3d 996 (Del. 2021).
[42] *Id*. at 1001.
[43] *Id*. (citations omitted).
[44] *Id*.

11

public body in Delaware to satisfy its burden of proof under FOIA in a manner that tracks the seriousness of the statute's purpose and policy.[45]

### B. The Existence of Responsive Records, and the Safety and Personnel File Exceptions to FOIA

Notwithstanding the statute's broad definition of what constitutes a "public record,"[46] FOIA limits government transparency in three ways. First, as a general matter, a public body has no obligation to create a new record in response to a request. Rather, FOIA requires only the production of existing records possessed or controlled by a public body. That is because one of FOIA's core aims is to provide the public access to the records that a public body *actively relies upon* in making decisions that affect the community. Records created purely for the purpose of responding to a FOIA request fall outside that aim.

Second, a public body has no obligation to produce records that are not within its possession or control.[47] A public body cannot reasonably be said to rely on records that it neither possesses nor has ready access to.

Third, Subsection 10002(o) provides nineteen categories of records that need not be disclosed under FOIA.[48] These exceptions define certain records as non-public, which in turn, fall outside FOIA's parameters.

Here, the parties dispute whether three of those exceptions apply. One of the three exceptions need not be addressed in this case: an exception that DSP contends

---

[45] *Jud. Watch*, 267 A.3d at 1011 (quoting 29 *Del. C.* § 10001).
[46] 29 *Del. C.* § 10002(o) defines "public record" as " information of any kind, owned, made, used, retained, received, produced, composed, drafted or otherwise compiled or collected, by any public body, relating in any way to public business, or in any way of public interest, or in any way related to public purposes, regardless of the physical form or characteristic by which such information is stored, recorded or reproduced."
[47] Logically, a public body cannot produce what it does not possess or control. Paragraph 10003(j)(1) addresses the procedure for responding to requests for noncustodial records that an agency controls but are housed with another agency.
[48] *See generally* 29 *Del. C.* § 10002(o).

permits it to deny disclosure based upon the Law Enforcement Officers' Bill of Rights (again, "LEOBOR").[49]  The requests that DSP relies upon LEOBOR for are already exempt under another exception, so the Court need not address it.

The two exceptions relevant in this appeal are:

(1) [a]ny personnel, medical or pupil file, the disclosure of which would constitute an invasion of personal privacy, under this legislation or under any State or federal law as it relates to personal privacy; [and]

. . .

(17)a. [t]he following records, which, if copied or inspected, could jeopardize the security of any structure owned by the State or any of its political subdivisions, or could facilitate the planning of a terrorist attack, or could endanger the life or physical safety of an individual:

. . .

(5) [t]hose portions of records assembled, prepared or maintained to prevent, mitigate or respond to criminal acts, the public disclosure of which would have a substantial likelihood of threatening public safety. The only items that are protected from disclosure by this paragraph are: . . . (A) [s]pecific and unique vulnerability assessments or specific and unique response or deployment plans, including compiled underlying data collected in preparation of or essential to the assessments or to the response or deployment plans[.][50]

Once again, the Court refers to the first exception as the "Personnel File Exception" and the second as the "Safety Exception" for ease of reference.

The Personnel File Exception has two requirements.  First, the records must be contained in a personnel, medical, or pupil file.  Second, disclosing them must constitute an invasion of personal privacy.

The Safety Exception, *as DSP attempts to apply in this case*, has more components and sets a higher bar.  Namely, relevant to Delaware Call's requests, the Safety Exception requires *all* of the of the following:  (1)  disclosure of the records could endanger individual life or physical safety; (2) the portions of the records at

---

[49] *See generally* 11 *Del. C.* c. 92.
[50] 29 *Del. C.* §§ 10002(o)(1)–(17)a.

13

issue were created or maintained to prevent, mitigate, or respond to criminal acts; (3) disclosure of the records would have a substantial likelihood of threatening public safety; *and* (4) the records fit within "specific and unique" vulnerability assessments or response/deployment plans or are underlying data collected to facilitate those assessments or plans.[51]

Delaware Call posits that the Safety Exception serves only "to prevent *terrorists* from utilizing state records to exploit state procedures and vulnerabilities."[52] For that premise, it points to the legislative history underscoring the Safety Exception's purpose. Specifically, Delaware Call emphasizes that "[t]he provision was introduced and enacted because 'Delaware's Freedom of Information Act as [then] written [did] not permit the State to withhold specific information about anti-terrorism planning and facility security that could be used by persons who seek to cause harm to Delawareans.'"[53] In that vein, Delaware Call contends that the statute's phrase, "or could endanger the life or physical safety of an individual," merits a narrow reading and is appended to the reference to preventing terrorism that immediately preceded it.[54]

To this end, Delaware Call advocates using the rule of statutory construction, *ejusdem generis*,[55] combined with the premise that FOIA's exemptions "are to be

---

[51] *Id*. §§ 10002(o)(17)a–(17)a(5)(A) (emphasis added).
[52] Opening Br. at 9 (D.I. 12).
[53] *Id*. (quoting Senate Bill No. 371, 141st Gen. Assemb. (Del. 2002)).
[54] *Id*. at 10; 29 *Del. C.* § 10002(o)(17)a.
[55] According to the statutory construction rule *ejusdem generis*, "where general language follows an enumeration of persons or things, by words of particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004); *see generally* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, Chap. 32 *Ejusdem Generis* Canon (2012).

14

narrowly construed."[56]  Delaware Call contends that applying this rule of statutory construction requires the Court to construe the phrase "could endanger the life or physical safety of an individual" as referring only to danger related to potential terrorist attacks.[57]  Delaware Call stresses that neither DSP nor the Chief Deputy raised an articulable concern that terroristic activity would result from the disclosure of the requested records.[58]  As a result, Delaware Call argues that DSP did not meet its burden on denial.

DSP counters that the Safety Exception's scope is not so limited.  It argues that were the Court to adopt Delaware Call's limited construction, it would require public bodies to ascertain a requesting party's motives when resolving FOIA disclosure inquiries.[59]  That, DSP asserts, is generally prohibited in the FOIA context.[60]  DSP also contends that the statutory construction rule *ejusdem generis* does not support Delaware Call's interpretation.[61]

In this case, this rule of statutory construction need not be considered because the text that creates the Safety Exception does not limit the exception to records that, if disclosed, could facilitate terrorist attacks.  Namely, its introductory paragraph provides:

> [t]he following records, which, if copied or inspected, could jeopardize the security of any structure owned by the State or any of its political subdivisions, *or* could facilitate the planning of a terrorist attack, *or* could endanger the life or physical safety of an individual[.][62]

---

[56] D.I. 12, at 10 (quoting *Flowers*, 167 A.3d at 545); *see ACLU v. Danberg*, 2007 WL 901592, at *3 (Del. Super. Mar. 15, 2007) (holding that "[t]he enumerated statutory exceptions to FOIA . . . pose a barrier to the public's right to access and are, therefore, narrowly construed").

[57] D.I. 12, at 10; 29 *Del. C.* § 10002(o)(17)a.

[58] D.I. 12, at 11.

[59] Answering Br. at 8 (D.I. 13).

[60] *Id*.

[61] *Id*. at 11.

[62] 29 *Del. C.* § 10002(o)(17)a (emphasis added).

15

The exception's language creates no ambiguity—it applies to three parallel and independent categories of records. Had the General Assembly intended the Safety Exception to apply only to records that, "if copied or inspected, . . . could facilitate the planning of a terrorist attack," it would have done so.[63] Instead, the plain language of the Safety Exception demonstrates the exception applies to two other parallel matters: records that if copied or inspected "could jeopardize the security of any structure owned by the State or any of its political subdivisions;" and those that "could endanger the life or physical safety of an individual."[64] As a result, the Court need not engage in judicial interpretation. It must apply the statute's plain meaning.[65]

The recognition that the Safety Exception may apply to individual safety does not resolve whether it shields the requested records from disclosure, however. Namely, three other requirements must be met—the weightiest of which, in this context, is the requirement that disclosure *would* cause a substantial likelihood of threatening public safety. The Chief Deputy used this exception to deny the entirety of Delaware Call's requests. For the reasons discussed below, DSP did not meet its burden when justifying the denials on that basis.

### C. Delaware Call's FOIA Request

The Chief Deputy erred when denying Delaware Call's seven requests in their entirety. At a high level, the names, ranks, and salaries of DSP troopers are

---

[63] 29 *Del. C.* § 10002(o)(17)a.

[64] *Id.* Also of note, Delaware Call's argument does not recognize that the planning or facilitation of a terrorist attack is not the first enumerated potential danger flowing from the disclosure of records that the General Assembly listed in Section 10002(o)(17)a. The potential danger of "jeopardize[ing] the security of any structure owned by the State or any of its political subdivisions" appears in the statute before the potential danger of terrorist attacks.

[65] *See Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999) (recognizing that where a statute is unambiguous, there is no need for a judicial interpretation, and the plain meaning of the statutory text controls).

contained in public records in DSP's possession or under its control. Disclosing that information does not compromise officer safety, privacy, or DSP operations in the same way as would producing duty assignments, troop assignments, personal demographics, or resumes. On this record, DSP did not demonstrate that the Safety Exception applies to any of the seven requests. It did meet its burden of demonstrating, however, that the Personnel File Exception exempts some of the requested records.

### 1. Names of Certified DSP Troopers

Delaware Call requested DSP to produce the names of all certified law enforcement officers. As a preliminary matter, DSP is responsible for only producing public records that it possesses or controls. Accordingly, it need not produce records regarding law enforcement officers employed by any other State or municipal agency. DSP's reliance on the overbreadth of the request as a reason for denial was not justified, however.[66] The Court construes Delaware Call's first request, as DSP should have, as referring only to actively certified DSP troopers.

Next, DSP contends that it fails to maintain a roster with the names of its troopers and that it need not create one. Granted, FOIA does not require a public body to produce records that do not exist, nor does it require the creation of a new record in response to a FOIA request.[67] In other words, as the Department of Justice

---

[66] Part of DSP's rationale in denying the Delaware Call's FOIA request for the "[n]ames of *all* certified law enforcement officers who are actively certified" was the operative use of the word "all" in the request. Undoubtedly, DSP does not comprise the entirety of "all" certified law enforcement officers in the State of Delaware. Nor would it possess records relating certified law enforcement officers in other state agencies or governmental subdivisions. Had this been DSP's sole reason for denying this specific request for records, it would surely have violated Paragraph 10003(d)(1)'s mandate "to provide reasonable assistance to the public in identifying and locating public records to which they are entitled access[.]" Denying a FOIA request on such an overbroad reading would be unreasonable and would violate FOIA's core purpose.

[67] The Attorney General has consistently recognized these principles, which in the Court's view is supported by the text of FOIA. *See generally* Del. Op. Att'y Gen. 18-IB34, WL 3947262, at *2

has correctly recognized, the "nonexistence of a record is a defense for the failure to produce or allow access to a record."[68] In a general sense, the Court must accept a public body's representations regarding whether records exist for purposes of FOIA.[69] The only caveat to this is that the public body must generally demonstrate by affidavit that it took efforts to determine whether the records exist.[70]

Here, DSP did not satisfy its burden of demonstrating that it need not produce the names simply because it does not maintain a separately dedicated roster containing them. In fact, the Doherty Affidavit's recitations can only be read to demonstrate the opposite. It recites that "DSP maintains computer systems that include *trooper names*, ranks, assignments and pedigree information."[71] Accordingly, DSP acknowledges that the records exist through the Doherty Affidavit.

Furthermore, FOIA requires access to public records "regardless of the physical form or characteristic by which such information is stored, recorded or reproduced."[72] It would defeat the letter and spirit of FOIA to not use a computer system in a manner that can isolate and produce only the troopers' names.[73] FOIA makes no "distinction between records maintained in manual and computer storage

---

(2018); Del. Op. Att'y Gen. 06-IB10, WL 1779491, at *2 (2006); Del. Op. Att'y Gen. 05-IB19, WL 2334347, at *5 (2005); Del. Op. Att'y Gen. 02-IB18, WL 32100328, at *1 (2002).

[68] Del. Op. Att'y Gen. 05-IB19, WL 2334347, at *5 (2005) (quoting Att'y Gen. Op. 96-IB28, WL 517455, at *2 (1996)).

[69] It has been the historical practice of the Attorney General's Office to accept a public body's representations regarding whether records exist for FOIA purposes.

[70] *Jud. Watch*, 267 A.3d at 1012 (holding that to meet its burden of proof, "a public body must state, under oath, the efforts taken to determine whether there are responsive records and the results of those efforts").

[71] D.I. 1, Ex. 7 (emphasis added).

[72] 29 *Del. C.* § 10002(o).

[73] Generating a printout of a selected field in a computer system or database is a widely available feature of computers in the modern age. Federal courts have recognized that databases and printouts are commonly used to comply with FOIA. *See generally*, *Shapiro v. United States Dep't of Just.*, 507 F. Supp. 3d 283, 333 (D.D.C. 2020).

systems."[74]  Producing easily disclosable information stored in a computer system does not require the creation of a new record.[75]

DSP alternatively denied the request on the basis of the Safety Exception, and the Chief Deputy relied on it when denying Delaware Call's petition. As explained next, DSP did not meet its burden of demonstrating that the exception applied.

At the outset, "it is the public body's burden, in the first instance, to establish the factual and legal bases for its refusal to provide information in response to a FOIA request."[76]  In an attempt to meet its burden, DSP produced two affidavits.[77] The  two affidavits recite no facts to support that the records are included as part of a "[s]pecific and unique vulnerability assessment or specific and unique response or deployment plan, including compiled underlying data collected in preparation of or essential to the assessments or to the response or deployment plans[.]"[78]  They also fail to justify reliance on the Safety Exception on two other bases.  To be exempt from disclosure, the record must also be both: (i) "assembled, prepared, or maintained to prevent, mitigate or respond to criminal acts," and (ii) its public

---

[74] *See* Del. Op. Att'y Gen. 97-IB06, WL 606408, at *3 (1997) (quoting *Yaeger v. Drug Enforcement Administration*, 678 F.2d 315, 321 (D.C. Cir. 1982)).

[75] *See* Del. Op. Att'y Gen. 06-IB17, at *4 (2006) (quoting *Yaeger v. Drug Enforcement Administration*, 678 F.2d 315, 321 (D.C. Cir. 1982) (providing that "[a]lthough accessing information from computers may involve a somewhat different process than locating and retrieving manually-stored records, these differences may not be used to circumvent the full disclosure policies of the FOIA.  The type of storage system in which the agency has chosen to maintain its records cannot diminish the duties imposed by the FOIA")).

[76] *Danberg*, 2007 WL 901592, at *3.

[77] DSP included affidavits from Chief Public Information Officer, India Sturgis, and from Captain James P. Doherty in support of its FOIA denial.  *See* Notice of Appeal, Ex. 7–8 (D.I. 1).  The Sturgis Affidavit indicated several concerns for officer safety.  Namely, it provided that DSP had received concerning phone calls and voicemails and that on one occasion, an individual walked a "threatening canine" around the perimeter of DSP's headquarters. D.I. 1, Ex. 8.  The Doherty Affidavit alleged that disclosure of all DSP officer's names would necessarily include officers who currently act or will act in an undercover capacity, and that releasing those names could subject them to potential harassment or danger in performing their official duties and personal affairs. D.I. 1, Ex. 7.

[78] 29 *Del. C.* § 10002(o)(17)a(5)(A).

19

disclosure "*would* have a *substantial likelihood* of threatening public safety."[79] The recitations in one of the affidavits cite random "concerning messages" and an unknown man walking a menacing dog around DSP headquarters. Those recitations do not meet DSP's burden of showing a substantial likelihood of a threat to public safety even when viewed with the deference due it as the responding agency.[80]

DSP further contends through the Doherty Affidavit that the names of its troopers fall within its personnel files and are highly confidential. FOIA does not define what a "personnel file" is, however. To fill that gap, the Department of Justice adopted the following definition through an AG Opinion: "a file containing information that would, under ordinary circumstances, be used in deciding whether an individual should be promoted, demoted, given a raise, transferred, reassigned, dismissed, or subject to such other traditional personnel actions."[81] Delaware Call also relied on that definition so the Court will do the same.[82]

DSP troopers' names are found within DSP personnel files as they would be in any other employers' personnel files. The determination of whether a record is properly considered part of a personnel file is resolved by its content rather than mere location, however. To that end, a public body may not restrict access to records otherwise disclosable under FOIA merely by placing them in a personnel file.[83]

---

[79] 29 *Del. C.* § 10002(o)(17)a(5) (emphasis added).
[80] D.I. 1, Ex. 8.
[81] Del. Op. Att'y Gen. 02-IB24, WL 31867898, at *1 (2002) (quoting *Connecticut Alcohol & Drug Abuse Commission v. Freedom of Information Commission*, 657 A.2d 630, 638 (Conn. 1995)). Here, the Attorney General recognized that this definition is consistent with other Delaware statutes defining "personnel file". *See generally* 19 *Del. C.* §731(3) (defining "personnel file" as "any application for employment, wage or salary information, notices of commendations, warning or discipline, authorization for a deduction or withholding of pay, fringe benefit information, leave records, employment history with the employer, including salary information, job title, dates of changes, retirement record, attendance records, performance evaluations and medical records").
[82] *See* D.I. 12, at 16.
[83] *See* Del. Op. Att'y Gen. 02-IB24, WL 31867898, at *2 (2002) (relying on *Denver Pub. Co. v. Univ. of Colorado*, 812 P.2d 682, 684 (Colo. App. 1990) (holding that a university could not restrict public access to a settlement agreement merely by placing it in a personnel file)).

Accordingly, DSP meets the first requirement of the Personnel File Exception—a personnel file inherently includes an employee's name.

The Personnel File Exception requires more, however. Namely, it requires a showing that disclosure "would constitute an invasion of personal privacy."[84] On this record, DSP fails to meet is burden. It does not identify what there is about a troopers' name, divested of his or her troop or duty assignment, that would invade his or her personal privacy. DSP's law enforcement officers are public employees who, when in uniform, wear their names on their uniforms. Their personal privacy will not be compromised to any greater degree than would the privacy of any other State or governmental subdivision employees. As a result, the names of certified troopers are not shielded from disclosure by the Personnel File Exception.

In summary, DSP possesses the records in question. The information is public because neither the Safety Exception nor the Personnel File Exception make it nonpublic. As a result, DSP must produce a roster of currently certified troopers pursuant to FOIA.

## 2. Current Salaries of Troopers

Below, the Chief Deputy declined to examine this request. He reasoned that he need not address it and the other five requests that followed because the troopers' names were not disclosable. Because a roster of their names constitutes information contained in a public record, the Court must examine whether salary information for each of the troopers is also public information.

DSP opposed disclosure of salary information on two bases. First, it again relied on the overbreadth of Delaware Call's request that referenced *all* certified officers in the State. Second, it contended that it does not maintain responsive information or records. To that end, DSP asserted that because salary information

---

[84] 29 *Del. C.* § 10002(o)(1).

for all law enforcement officers is available on the Delaware state employee salaries page of the "Open the Books" website, it need not respond.[85]  As explained, DSP did not meet its burden in denying this request based on either basis.

At the outset, DSP has no obligation to provide salary information that it does not possess or control.  To that end, it has no obligation to do so regarding the significant number of county and municipal police agencies throughout the state. Nevertheless, as the Court explained above, Delaware Calls' request properly applies to troopers employed by DSP.

DSP does not contend that any FOIA exception applies to such information. Salary information of state employees is recognized public information and the records that compose them are public records.  Namely, as the Superior Court recognized in *Gannett Co., Inc. v. Christian*, taxpayer funded salaries of public employees are subject to disclosure under FOIA.[86]  There, the court held that a school district must produce the salaries of its administrators pursuant to FOIA despite the district's attempt to withhold them under the Personnel File Exception.[87]  The court persuasively reasoned that "[a]lthough some might feel that the amount of their salary is personal, it is generally recognized that the public has a legitimate interest in knowing the salaries of persons who are paid with public funds and public employees have no right of privacy in this information."[88]  There is nothing intrinsically different in the privacy interest in a trooper's salary versus the salary of a school administrator or any other public employee.

Furthermore, DSP's identification of a third-party website does not obviate its duties under FOIA to provide records responsive to Delaware Call's request for

---

[85] D.I. 1, Ex. 3 (including a link to https://www.openthebooks.com/delaware-state-employees/).
[86] 1983 WL 473048, at * 1 (Del. Super. Aug. 19, 1983).
[87] *Id*.
[88] *Id*.

salary information.[89]  "Open the Books" is neither a Delaware government-operated website, nor is it a public record as defined in FOIA.  DSP has not met its burden of demonstrating that salary information regarding its officers is exempted from disclosure.  While a separate State agency such as the Department of Human Resources may be the stewards of that information, DSP took no effort to meet its burden by demonstrating that it has no access to such records.[90]  DSP must produce records of its troopers' salary information because it is information contained in a public record.

### 3.  Current Employing State Agency and Rank of each Certified Trooper

It goes without saying that the current employing state agency of each certified DSP officer is DSP.  As to the rank of each certified trooper, DSP's affidavits recite no facts to justify denying this request other than on the basis that it does not maintain a listing with the various ranks of its officers.  Rather, the Doherty Affidavit recites that "DSP maintains computer systems that include trooper . . . ranks."[91]  The records are clearly within DSP's possession.

Moreover, DSP did not make the requisite showing by affidavit or otherwise to invoke the Safety Exception.  Specifically, DSP has neither alleged in its affidavits, nor raised arguments to establish any of the following four requirements under the Safety Exception: (1) that disclosure of DSP officer ranks could endanger individual life or physical safety; (2) that DSP officer ranks are records assembled, prepared, or maintained to prevent, mitigate, or respond to criminal acts; (3) that public disclosure of DSP officer ranks would have a substantial likelihood of

---

[89] DSP asserted in a supplemental letter brief that OpenTheBooks.com is a web-portal used by the State of Delaware to publish the salaries of all Delaware state employees.  D.I. 21, at 3.  There is no evidentiary support for this assertion, however.

[90] *See* 29 *Del. C.* §10003(j)(1) (requiring a public body, such as DSP, to "promptly request that the relevant custodian provide the noncustodial records to the public body.").

[91] D.I. 1, Ex. 7.

23

threatening public safety; or (4) that DSP officer ranks fall within specific and unique vulnerability assessments or response/deployment plans, or underlying data collected to support them.[92]  Troopers prominently display their ranks on their uniforms as they do on their names.  On this record, trooper ranks, uncoupled from their troop or duty assignments, do not in isolation fall within the Safety Exception. On balance, DSP did not did not meet its burden in relying on this exception when refusing to produce the ranks of currently active and certified troopers.

Finally, when considering the Personnel File Exception, the disclosure of certified DSP officer ranks does not constitute an invasion of personal privacy.  The Chief Deputy did not address this in his opinion and DSP made no attempted showing to justify its denial, either below or in its briefing.  On balance, DSP admits via the Doherty Affidavit that it has the records and no FOIA exception applies.  DSP must produce its troopers' current ranks.

### 4.  Past Employers and Job Titles of Each Certified Trooper

DSP plainly represented in the initial denial of Delaware Call's request that they do not maintain such records for currently employed troopers.  It also represented through the Doherty Affidavit that they do not keep such records.  As previously discussed, DSP has no obligation under FOIA to produce records that it does not maintain.  Accordingly, given the deference due DSP, it meets its burden and need not produce records in this instance.[93]

---

[92] *See* 29 *Del. C.* §§ 10002(o)(17)a–(17)a(5)(A).

[93] In a Supplemental Letter Brief (D.I. 24), Delaware Call offered *Invisible Institute v. District of Columbia* as persuasive authority supporting the disclosure of the past employers and job titles of each certified trooper.  2023-CAB006295, slip. op. (D.C. Super. Ct. Aug. 21, 2024) (amended order granting summary judgment).  There, the District of Columbia Superior Court held, *inter alia*, that Metropolitan Police Department officers' privacy interest in the release of their past employment histories did not outweigh the strong public interest in having access to this information.  *Id*. at 15–16, 21.  This opinion is distinguishable, however.  There, the court applied D.C. Code § 2–534(a)(2)—D.C.'s version of Delaware FOIA's 29 *Del. C.* § 10002(o)(1).  That code section differs

## 5. Troopers' Resumes

DSP's denial of this request hinges first on its insistence that it does not generally maintain resumes for its troopers as a matter of course.[94] While DSP recognizes that it possesses some of its trooper's resumes, it maintains that they are non-public under the Personnel File Exception.

In support of this request, Delaware Call relies primarily on the Superior Court's holding in *Grimaldi v. New Castle County*[95], as well as various Attorney General Opinions. *Grimaldi*, it contends, requires the release of public employees' resumes.[96] In that vein, Delaware Call asserts that the resumes of public employees are not exempt from disclosure under the Personnel File Exception and that a balancing of public interests against privacy interests weighs in favor of disclosure.[97] DSP, for its part, counters that *Grimaldi* does not support Delaware Call's contention and that resumes properly fall within the Personnel File Exception.[98]

For multiple reasons, the Court does not find the *Grimaldi* decision applicable or persuasive. That decision addressed, *inter alia*, a FOIA request seeking disclosure of a county risk manager's resume.[99] The court held that, in that specific instance,

---

from its Delaware analogue in a key respect: the inclusion of the phrase "clearly unwarranted". In this regard, D.C. FOIA exempts "information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." D.C. Code § 2–534(a)(2). Consequently, the term "clearly unwarranted" required the court to conduct a balancing between the privacy interest as created by the D.C. legislature and the public's legitimate interest in having access to the information. *Invisible Institute*, 2023-CAB006295, at 15. In contrast, Delaware FOIA's Section 10002(o)(1) does not include the phrase, "clearly unwarranted". To that extent, it is unclear what balancing test Delaware courts must perform. The Court does not undertake to provide that answer here. In this case, the Court is persuaded by DSP's assertion that it does not maintain records responsive to this request. A public body cannot produce records it does not possess.

[94] DSP explained that it does not request resumes as part of its application process. D.I. 13, at 17.
[95] 2016 WL 4411329 (Del. Super. Aug. 18, 2016)
[96] D.I. 12, at 21.
[97] *Id.*; Reply Br. at 16 (D.I. 14).
[98] D.I. 13, at 18.
[99] *Grimaldi*, 2016 WL 4411329, at *2.

disclosure of the relevant resume would not constitute an invasion of personal privacy but offered little supporting comment on why.[100] Moreover, the decision did not advocate a brightline rule requiring the disclosure of all public employee's resumes.[101] Instead, it merely provided for the disclosure of "information the successful applicant disclosed during the application process."[102] Finally, upon closer inspection, the *Grimaldi* court relied in significant part upon an Attorney General Opinion—nonbinding authority upon the Court—that itself did not address the disclosure of resumes.[103]

More appropriately, the disclosure of one's resume impacts an individual's privacy interests differently than would the disclosure of mere names, ranks, and salaries. Resumes typically contain information that the release of which would constitute an invasion of personal privacy. For instance, the home address, personal phone number, and email address of the applicant are typically contained within a resume. Taken with the fact that Delaware FOIA has no explicit segregability requirement, ordering such disclosure would constitute an invasion of personal privacy.[104] Furthermore, the personal privacy interests of law enforcement officers who serves undercover duty or in other highly sensitive roles are often heightened

---

[100] *Id.*

[101] Delaware Call admitted as much in its reply brief. D.I. 14, at 16. The Department of Justice has also recognized *Grimaldi's* limitations. *See* Del. Op. Att'y Gen. 18-IB34, WL 3947262, at n. 19 (2018) (recognizing that "[a]lthough *Grimaldi* supports disclosure of the resume in these specific circumstances, we do not interpret this decision to create a bright line rule for the release of all public employee resumes").

[102] *Grimaldi*, 2016 WL 4411329, at *9.

[103] *See id.*(relying on Attorney General Opinion 99-IB03, which addressed only whether a town was required to disclose in a council meeting agenda the *name or names of applicants for a job*, and not whether disclosing resumes through FOIA would constitute an invasion of privacy).

[104] Disclosure of the personal information contained within a resume would subject DSP officers to an increased risk of harassment in their personal capacity. It is well recognized that members of the public may carry grievances against officers for perceived transgressions. Granting the public access to an officer's personally identifying information within a resume would no doubt invade an officer's right to privacy. One important aspect of privacy in this settling is an officer's interest in his or her safety.

in comparison to those of many other public employees. Thus, trooper resumes, to the extent that DSP has any, are exempt from disclosure under the Personnel File Exception.

### 6. List of Formerly Certified Troopers and Current Status

Here, DSP represents through its initial denial and the Doherty Affidavit that it maintains no such records. When applying the deference due, DSP meets its burden of demonstrating that it does not possess the records. As such, it has no obligation to create such a record. Disclosure is not required on that basis.

### 7. Age, Sex, and Race of Each Certified DSP Trooper

DSP acknowledges, through the Doherty Affidavit, that it maintains this information in its computer system. Here, it relies on the Personnel File Exception when denying Delaware Call's request for the age, sex, and race information of each certified DSP officer ("demographic information"). Delaware Call contends that such demographic information falls outside the definition of a personnel file even though the information may be housed within a personnel file. In response, DSP contends that the Personnel File Exception exempts this information from public disclosure because it treats the demographic information of its troopers as part of their personnel files and the information implicates significant personal privacy interests.

As the Court previously explained, public records are not shielded from disclosure merely because they are placed in a personnel file. To that end, in its opening brief, Delaware Call seizes on the phrase "traditional personnel actions" within the definition the Court adopted for personnel files.[105] Delaware Call argues

---

[105] *Id*. Again, the Court adopts the following definition of "personnel file": a file containing information that would, under ordinary circumstances, be used in deciding whether an individual should be promoted, demoted, given a raise, transferred, reassigned, dismissed, or subject to such other traditional personnel actions.

27

that demographic information "is not, and must not be" information used by a public body for the purposes of making traditional personnel actions, but cites no supporting authority for its position.[106] DSP likewise cites no supporting authority for its contrary position, DSP counters, though, that although traditional personnel actions may not be taken based upon demographic information, such information can nevertheless be properly placed within a personnel file.[107]

Although traditional personnel actions should not be based on one's age, race, sex, or other protected classification, DSP is not a traditional employer and its personnel files may merit different considerations.[108] Given the line of work DSP performs, the records and information it properly keeps within its personnel files may differ from that of other public employers at times. Namely, there are several conceivable bases upon which demographic information is necessary for DSP's personnel actions.[109] For instance, a trooper may need to serve in an undercover capacity and disclosing such information would significantly compromise his or her personal privacy (not to mention his or her safety which should be deemed an aspect and goal of one's personal privacy). Accordingly, demographic information fits within the scope of DSP's personnel files and DSP troopers' personal privacy would be compromised were it to be disclosed.[110]

---

[106] D.I. 13, at 16–17.
[107] D.I. 13, at 17.
[108] DSP's core purpose is to protect the public at large by preventing, mitigating, and responding to criminal activity. Given this purpose, DSP warrants different considerations as an employer.
[109] Consider for example, that a grocery store may have no need for demographic information in its personnel files. That does not automatically preclude such need from all other employers. Demographic information may conceivably be implicated in assigning DSP officers to undercover or intelligence roles that require officers with certain characteristics for a specific assignment.
[110] See generally Del. Op. Att'y Gen. 94-I019, at *1 (1994) (opining that date of birth and other comparable date possess the characteristics of personnel files).

## IV. CONCLUSION

For the reasons above, the Chief Deputy's order must be affirmed, in part, and reversed, in part. DSP must produce the following:

1. a listing by name of all currently employed DSP troopers;

2. their ranks; and

3. their salary information.

All other requested information, including troopers' personal demographic data, past employers, listings of formerly certified officers and their current status, and any resumes in DSP's possession regarding currently employed troopers need not be produced because DSP either does not possess the information or it is non-public under FOIA.